DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 173594
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
CARA R. MEYER, SBN 348877
Deputy City Attorney
Fox Plaza
1390 Market Street, 7th Fl.
San Francisco, California 94102-5408
Telephone:    (415) 554-4212 (Meyer)
Facsimile:    (415) 437-4644
E-Mail:        Cara.Meyer@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, <br><br> Plaintiff, <br><br> vs. <br><br> UNITED STATES DEPARTMENT OF ENERGY; CHRISTOPHER WRIGHT, in his official capacity as Secretary of Energy, <br><br> Defendant. | Case No.  3:26-cv-05455 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      Plaintiff the City and County of San Francisco ("San Francisco" or "City") has long received and relied on funding from the U.S. Department of Energy ("DOE") to support energy efficiency and conservation, electric vehicle infrastructure, and renewable energy deployment. For example, for over thirty years the City has been a member of DOE's Clean Cities and Communities Coalition Program ("Clean Cities Program"), through which San Francisco has worked alongside

coalition members and DOE to vindicate congressional intentions to reduce the nation's dependence on foreign oil. San Francisco has recently been awarded Clean Cities funding, but the City's access to this funding, and all other DOE funding, is threatened.

2. Through newly announced Standard Terms and Conditions, DOE now seeks to impose a new condition on all DOE funding—whether provided through congressionally authorized federal grant programs, cooperative grant agreements, or financial assistance awards. Specifically, DOE's new Standard Terms and Conditions require funding recipients to agree to and certify compliance with an interpretation of antidiscrimination law that is legally unsupported and ambiguous (the "Discrimination Condition"). By unilaterally imposing a condition that Congress has not authorized and bears no connection to the funding programs Congress established, Defendants usurp Congress's power of the purse and violate numerous other constitutional and statutory protections.

3. This Discrimination Condition constitutes an impermissible attempt by the Executive Branch to coerce San Francisco into implementing certain policy objectives, in contravention of the separation of powers and other bedrock principles of the United States Constitution, settled civil rights and antidiscrimination law, and the Administrative Procedure Act ("APA").

4. Defendants' attempts to condition all DOE funding on this unlawful condition harms San Francisco by threatening awarded and soon to be awarded funds that the City relies on to support critical programs and services for its residents, including the cooperative agreement funding Plaintiff has long received through DOE's Clean Cities Program to support adoption of alternative fuel vehicles in its communities. If the unlawful grant condition stands, San Francisco will be forced to forgo Clean Cities funding and prevented from accessing any other DOE funding. San Francisco therefore seeks a declaratory judgment that Defendants' adoption and application of the Discrimination Condition are unlawful, injunctive relief barring Defendants from applying or enforcing the Discrimination Condition or any materially similar conditions, and an order vacating and setting aside the Discrimination Condition in DOE's Standard Terms and Conditions under the APA.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction under 28 United States Code section 1331 because this is a civil action arising under the Constitution and other laws of the United States.

6.     In addition to its other remedial authorities, this Court has authority to issue declaratory relief under the Declaratory Judgment Act, 28 United States Code sections 2201–02.

7.     Venue properly lies within the Northern District of California under 28 United States Code sections 1391(b)(2) and 1391(e)(1) because Plaintiff City and County of San Francisco is in this judicial district; no real property is involved in this action; and a substantial part of the events or omissions giving rise to this action occurred in this District.

### DIVISIONAL ASSIGNMENT

8.     Assignment to the San Francisco Division of this District is proper under Civil Local Rules 3-2(c)–(d) because the San Francisco Division is the Division serving San Francisco, which is where a substantial part of the events or omissions giving rise to the claims asserted below occurred, and is therefore where this action arises.

### PARTIES

**I.     Plaintiff**

9.     Plaintiff City and County of San Francisco is a municipal corporation organized and existing under and by virtue of the laws of the State of California and is a charter city and county.

**II.     Defendants**

10.     Defendant DOE is a cabinet agency within the executive branch of the United States government. 42 U.S.C. § 7131. DOE manages and coordinates federal energy functions and responsibilities. *Id.* § 7133. DOE is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

11.     Defendant Christopher Wright is the Secretary of Energy of the United States and DOE's highest-ranking official. He is charged with the supervision and management of all directions and actions of that agency. 42 U.S.C. § 7131. He is sued in his official capacity.

### FACTUAL BACKGROUND

**I.     DOE Funding Supports National Energy and Conservation Efforts Through Awards Authorized by Congress**

12.     DOE offers grants to fund research, development, and other initiatives that align with its mission "to ensure America's security and prosperity by addressing its energy, environmental and

COMPLAINT
CASE NO.

3

nuclear challenges through transformative science and technology solutions."[1] DOE grants support projects that help secure America's energy future, protect the environment, and advance scientific understanding.[2]

13. San Francisco receives various DOE grants to support municipal energy planning and conservation, the development and implementation of building performance standards, and programs to reduce emissions. Among these grants, San Francisco receives funding as a coalition member of DOE's Clean Cities Program to aid in the effort to transition to alternative fuel solutions.

14. DOE's grant programs, including the Clean Cities Program, are authorized by Congress.

**A.    Congress Authorized DOE's Clean Cities Program Through the Energy Policy Act of 1992**

15. In 1992, following successive energy crises, Congress addressed the need to invest in alternative fuel sources and infrastructure to reduce the nation's dependence on foreign imported oil. Through the Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776 (1992), Congress required vehicle fleets owned or operated by federal and state governments to purchase an increasing percentage of vehicles that run on alternative fuel. Recognizing that reducing the nation's dependence on oil required state and local investment, Congress directed the Secretary of Energy to consult with "individuals and organizations with practical experience in the production and use of alternative fuels and alternative fueled vehicles" to establish a public information program "on the benefits and costs of the use of alternative fuels in motor vehicles," 42 U.S.C. § 13231, to obtain commitments from fuel suppliers "in geographically diverse regions," *id.* § 13255, and to create a state and local incentive program "to accelerate the introduction and use" of alternative fuels and vehicles, *id.* § 13235. Congress further authorized the Secretary of Energy to enter into "cooperative agreements and joint ventures" with local governments "to demonstrate the feasibility of commercial application of alternative fuels for urban buses." *Id.* § 13236.

---

[1] U.S. Dep't of Energy, Mission, https://www.energy.gov/mission [https://perma.cc/2EA3-QTUF].

[2] U.S. Dep't of Energy, Grants, https://www.energy.gov/topics/grants [https://perma.cc/VZG6-R48L].

COMPLAINT
CASE NO.

4

4918-0218-3602

16.    To carry out Congress's instructions, in 1993 DOE created the Clean Cities Program to provide technical, informational, and financial resources to both regulated fleets and voluntary adopters of alternative fuels.[3] Among other goals, the Clean Cities Program was designed to encourage development of refueling facilities at the local level and to educate the public about alternative fuel vehicles.[4] The Clean Cities Program provides funding in the form of federal cooperative agreements to local and regional coalitions in the private and public sector, including local governments.[5] Coalition members use this funding to track the deployment of alternative and renewable fuels, reduce emissions, improve fuel economy, and invest in emerging transportation technologies at the local level. DOE lauds the Clean Cities Program coalitions as "strengthen[ing] the nation's environment, energy security, and economic prosperity by working locally to advance affordable, reliable, and secure transportation fuels and technologies."[6]

17.    Historically, DOE's Office of Energy Efficiency and Renewable Energy administered the Clean Cities Program through its Vehicle Technologies Office by approving applicants to the coalition, reviewing coalition members' work annually, and performing a thorough re-designation assessment of coalition partners every five years. In November 2025, DOE eliminated the Office of Energy Efficiency and Renewable Energy. The Clean Cities Program is now administered through a

---

[3] The Energy Policy Act of 1992's public information program (42 U.S.C. § 13231), and the state and local incentive program (42 U.S.C. § 13235), along with Section 505 in Title V (42 U.S.C. § 13255), form the basis for the Clean Cities program activities. U.S. Dep't of Energy, *Report to Congress: Review of Energy Policy Act of 1992 Programs and the Alternative Fuel Provider Fleet Mandate* 12 (Dec. 10, 2008), available at https://epact.energy.gov/pdfs/704_report_final.pdf?utm [https://perma.cc/K7FC-V85W].

[4] In 1994, the U.S. General Accounting Office reported: "[I]n an effort to leverage the effect of federal [alternative fuel vehicle] purchases, DOE developed its Clean Cities Program. By working with local participants in selected cities with a strong interest in alternative fuels, the agency hopes to combine federal, state, local, and commercial efforts to encourage the development of an adequate number of refueling facilities for alternative fuels." U.S. Gen. Accounting Office, *Alternative-Fueled Vehicles: Progress Made in Accelerating Federal Purchases, but Benefits and Costs Remain Uncertain*, GAO/RCED-94-161 (1994), https://www.govinfo.gov/app/details/GAOREPORTS-RCED-94-161 [https://perma.cc/KCZ7-HSGN].

[5] "An executive agency shall use a cooperative agreement . . . when . . . substantial involvement is expected between the executive agency and the . . . recipient." 31 U.S.C. § 6305(2).

[6] Clean Cities & Communities Coalitions, U.S. Dep't of Energy, https://cleancities.energy.gov/coalitions/locations [https://perma.cc/5YSR-3FBQ].

partnership between DOE's Office of Critical Minerals and Energy Innovation and the DOE Transportation Technologies Office.

18.    Today, seventy-five Clean Cities coalitions work in urban, suburban, and rural areas to build bridges between national priorities and local needs. Roughly ninety-two percent of the total U.S. population lives within the boundaries of a designated coalition.[7]

19.    San Francisco has been a Clean Cities coalition member since 1994. With Clean Cities funding, San Francisco works with vehicle fleets, fuel providers, community leaders, and other stakeholders to identify community-driven choices that save energy and promote the use of alternative fuels and advanced vehicle technologies in transportation. Clean Cities funding has supported San Francisco to facilitate installing over 1600 electric vehicle chargers and reducing gasoline use by 6.6 million gallons annually.

**II.    DOE Amends its Standard Terms and Conditions to Include an Unlawful and Unconstitutional Condition**

20.    On information and belief, on or before April 12, 2026, DOE posted a document titled "Standard Terms and Conditions" to its website, www.energy.gov. Ex. 1 (DOE Standard Terms and Conditions).

21.    The Standard Terms and Conditions apply to "all applicable DOE awards" including San Francisco's Clean Cities cooperative funding and any future grant funding or financial assistance from DOE that may be available to the City. Ex. 1 at p. 1.

22.    Subpart II.L of the Standard Terms and Conditions, the Discrimination Condition, is titled "Implementation of Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity." Ex. 1 at p. 22. The Discrimination Condition requires all recipients to "comply in all respects with all applicable federal anti-discrimination laws." *Id.* By "requesting a drawdown or reimbursement of funds," the City must "certif[y] that it does not operate programs promoting diversity, equity, and inclusion that violate any applicable federal anti-discrimination laws." *Id.* The Discrimination Condition further provides that "[c]ompliance with such Federal laws is material to

---

[7] *Id.*

DOE's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code," the federal False Claims Act. *Id.*

23.    The title of the Discrimination Condition purports to implement Executive Order 14173, issued by President Trump on January 21, 2025, which targets policies relating to diversity, equity, and inclusion as "violat[ing] the text and spirit of our longstanding Federal civil rights laws" and "undermin[ing] the traditional American values of hard work, excellence, and individual achievement." Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025). The Discrimination Condition also mirrors the language of Executive Order 14173, stating "[i]t is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work." Ex. 1 at p. 22.

24.    While the City has routinely certified compliance with federal antidiscrimination laws as a condition of federal funding in the past, Defendants have thrown into doubt the well-established meaning of such a certification. Since his inauguration, President Trump has issued a series of executive orders purporting to target any program that advances diversity, equity, and inclusion ("DEI") goals. For example, he issued orders directing all federal agencies to "terminate . . . 'equity-related grants'"—without defining "equity-related" or even "equity"—and to require grant recipients to certify that they do not operate any programs "promoting" diversity, equity, inclusion, and accessibility "that violate any applicable Federal antidiscrimination laws" in all grant terms. Going further, President Trump ordered that discretionary grant awards must "demonstrably advance the President's policy priorities" and "shall not be used to fund, promote, encourage, subsidize, or facilitate" whatever the Trump administration may deem to be "racial preferences or other forms of racial discrimination by the grant recipient."[8] Alongside these executive orders, the Department of Justice has issued guidance that purports to describe what antidiscrimination law requires, but instead advances an ideological agenda that presents a contradictory, ambiguous, and legally unsupported

---

[8] Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025); Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 31, 2025).

distortion of federal antidiscrimination law as prohibiting any program or activity that takes into account or encourages diversity, equity, and inclusion.

25.    The City now faces significant uncertainty as to what the Discrimination Condition means. As described below, actions taken by the Trump administration demonstrate that Defendants have adopted a contradictory and legally unsupported interpretation of federal civil rights and antidiscrimination statutes and caselaw. This incorrect interpretation is reflected in the Discrimination Condition—which could be read to suggest that "programs promoting diversity, equity, and inclusion" violate Federal antidiscrimination laws—and casts doubt on the meaning of the Discrimination Condition.

26.    This uncertainty is further exacerbated because the City must stipulate that compliance with antidiscrimination law is material for purposes of the federal False Claims Act—which threatens to expose the City to significant penalties for conditions that have been rendered unascertainable by Defendants' unsupported pronouncements on what antidiscrimination laws require. Thus, any relief with respect to the Discrimination Condition must also clarify that references to antidiscrimination laws mean those statutes as enacted by Congress and interpreted by the judiciary, such that it would not be a violation of the Discrimination Condition for a grantee to take actions that comply with the law as interpreted by the courts, even if those actions run counter to the Executive's view of those laws.

27.    On July 29, 2025, then-Attorney General Pamela Bondi issued a memorandum titled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination" ("July Bondi Memo"). The July Bondi Memo purports to "clarif[y] the application of federal antidiscrimination laws" and indicates that the guidance is applicable to all "[e]ntities that receive federal financial assistance . . . including . . . state and local governments." Ex. 2 (July Bondi Memo) at p. 1.

28.    But, in fact, the July Bondi Memo effectively casts any DEI program as discriminatory. More specifically, the July Bondi Memo asserts that practices and policies designed to support historically marginalized groups—including training and educational programs, scholarships, and hiring and application policies—are, under the Trump administration, unlawful and discriminatory. *See* Ex. 2 at pp. 4–8 (classifying as unlawful training programs that purportedly "stereotype

COMPLAINT
CASE NO.

4918-0218-3602

individuals" by discussing concepts such as racial privilege and "toxic masculinity"; hiring practices that "prioritize[] candidates from 'underrepresented groups' for admission, hiring, or promotion, bypassing qualified candidates who do not belong to those groups"; requirements that candidates demonstrate "cultural competence" or "cross-cultural skills"; and policies that "set[] racial benchmarks or mandate[] demographic representation in candidate pools, such as requiring a certain percentage of finalists to be from 'diverse' backgrounds.").

29.     In many respects, the July Bondi Memo contradicts judicial interpretation of antidiscrimination laws. For example, the Memo goes so far as to assert that even the use of "[f]acially neutral criteria (e.g., 'cultural competence,' 'lived experience,' geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." Ex. 2 at p. 2. That assertion is inconsistent with Supreme Court precedent that has "consistently declined to find constitutionally suspect" the adoption of race-neutral criteria—even where the decision-maker was "well aware" the race-neutral criteria "correlated with race." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) (cleaned up) (citing *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015)). The July Bondi Memo also asserts that funding recipients "should affirm sex-based boundaries rooted in biological differences," Ex. 2 at p. 6, contrary to Supreme Court precedent applying Title VII sex-based protections to transgender people, *see Bostock v. Clayton Cnty.*, 590 U.S. 644, 662, 670 (2020).

30.     Defendants have usurped both the legislative and the judicial functions by weaponizing the Discrimination Condition to attempt to impose the Executive's unsupported view of what these laws mean.

31.     The City now faces the risk that, in certifying compliance with the Discrimination Condition, the City is certifying compliance with these laws not as written by Congress and interpreted by the courts, but as reconceptualized by the Executive Branch.

32.     As a practical matter, the Discrimination Condition also makes it impossible for the City to comply, on the one hand, with the guidance of the July Bondi Memo and, on the other hand, with the actual mandates of settled federal antidiscrimination law.

33.    And, as discussed further below, Defendants have only raised the stakes by attempting to require the City to concede materiality for purposes of the False Claims Act in order to draw down or seek reimbursement from DOE for Clean Cities funding or any other award.

**III.    DOE's Standard Terms and Conditions Foreclose the City from Accessing Funds Appropriated by Congress**

**A.    Congress Appropriates Clean Cities Funding for Fiscal Year 2026**

34.    Funding for the Clean Cities Program comes from congressional discretionary appropriations.

35.    Congress appropriated funds for the Office of Energy Efficiency and Renewable Energy in the Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act of 2026. Pub. L. No. 119-74, 140 Stat. 74 (2026). In an explanatory statement accompanying the Act, Congress directed "not less than $85,000,000 for Vehicle Technology Integration and Deployment." Explanatory Statement for the Energy and Water Development Appropriations Bill, 2026, 172 Cong. Rec. H330–H470, H391 (daily ed. Jan. 8, 2026).[9]

**B.    DOE Awards 2026 Clean Cities Funding to the City**

36.    On February 20, 2026, San Francisco's Department of the Environment received an email from DOE announcing that DOE had opened 2026 Clean Cities funding and inviting San Francisco to apply for a 2026 coalition cooperative agreement.

37.    As it had for over thirty years, the City submitted an application for the Clean Cities Program coalition funding.

38.    On April 1, 2026, the City received a Clean Cities cooperative award of $130,000 for the period April 1, 2026 through March 31, 2027. For reasons discussed below, the City has sought an extension through August 1, 2026 to draw down these funds.

39.    The City intends to use this funding to facilitate the adoption of alternative fuels, educate and connect local communities to alternative fuel opportunities, and develop strategic

---

[9] The 2026 Appropriations Act directs that the explanatory statement "shall have the same effect with respect to the allocation of funds and implementation of divisions A through C of this Act as if it were a joint explanatory statement of a committee of conference." Pub. L. No. 119-74, 140 Stat. 5-6 (2026).

COMPLAINT
CASE NO.

4918-0218-3602

programs and activities to promote and expand the use of alternative fuel vehicles. The City has budgeted Clean Cities funding to establish a new electric vehicle working group with key stakeholders in local government and private industry, to update San Francisco's Electric Vehicle Service Provider Packet to connect potential EV charging site hosts with recommended local contractors and quality equipment manufacturers, to collect community feedback on curbside charging experiences and identify opportunities for improvement, and to participate in regional planning discussions to provide input on logistics coordination, transit integration, and community activation strategies concerning alternative fuel sources. The City also plans to use this funding to support regular Clean Cities reporting which includes tracking critical data on alternative fuel prices, infrastructure development, and greenhouse gas emissions reductions.

40.    San Francisco relies on this funding to support staff positions, conduct outreach, track critical fueling and infrastructure data to inform future planning, and coordinate the infrastructure needed for alternative fuel adoption. Clean Cities awards are the only funding mechanism available to San Francisco's Department of the Environment for direct outreach and engagement with small businesses, residents, and small- and medium-sized fleets that lack the resources to purchase electric vehicles. The City further depends on this funding to support work with surrounding coalitions to share best practices with other jurisdictions and to collaborate and multiply impacts on a regional scale.

### C.    San Francisco is Forced to Accede to the Discrimination Condition or Cease all DOE Drawdowns and Reimbursements, Including Clean Cities Funding

41.    The Discrimination Condition puts the City in an impossible position. If the City draws down on the Clean Cities funding it has counted on for over three decades, the City puts itself at risk of civil and criminal penalties. If the City rejects the Discrimination Condition and thereby gives up its Clean Cities funding, the City must forego important staffing, community initiatives, and coordination with a proven record of lowering fossil fuel emissions. As alleged below, this dilemma is unconstitutional, and it inflicts substantial budget uncertainty on Plaintiff.

42.    Moreover, the City also faces the threat of liability under the False Claims Act. That statute imposes substantial civil liability on "any person who . . . knowingly presents, or causes to be

presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). If a city is found liable, it faces potential treble damages, which could result in a judgment far exceeding the amount of federal funds received in the first place. What is more, the same conduct—presentation of a false or fraudulent claim material to the federal government's issuance of payment—may also give rise to criminal liability, including up to five years' imprisonment. 18 U.S.C. § 287.

43. The Administration has clearly communicated its intent to use the False Claims Act as a cudgel to impose their interpretation of antidiscrimination law under the guise of enforcing the Discrimination Condition. On May 19, 2025, DOJ announced the creation of a "Civil Rights Fraud Initiative"—co-led by DOJ's Civil Fraud Section and Civil Rights Division—that will "utilize the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates civil rights laws"—or, more accurately, the Administration's reimagining thereof as reflected in the July Bondi Memo. DOJ's announcement asserts that the False Claims Act "is implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin." It further states that "[t]he Civil Fraud Section and the Civil Rights Division will also engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal funding recipients."[10]

44. DOJ reaffirmed this threat to weaponize the False Claims Act on June 11, 2025 when Assistant Attorney General Brett Shumate announced his intent to dedicate "all available resources" of the DOJ Civil Division "to pursue affirmative litigation combatting unlawful discriminatory practices" and to "aggressively investigate and, as appropriate, pursue False Claims Act violations against recipients of federal funds that knowingly violate civil rights laws."[11]

---

[10] Deputy Att'y Gen'l, Civil Rights Fraud Initiative (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl [https://perma.cc/MFC5-YDGU].

[11] Asst. Att'y Gen'l, Civil Division Enforcement Priorities (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl [https://perma.cc/QL7T-33TH].

45.　This threat is only underscored by the requirement that the City agrees to a condition stating that compliance with antidiscrimination law is "material" for purposes of the False Claims Act. *See* Ex. 1 at p. 22.

46.　San Francisco therefore faces the prospect that, if the City draws down or seeks reimbursement under any DOE award, it could face investigation, prosecution, and liability for treble damages under the Administration's interpretation of antidiscrimination law.

47.　Yet, declining to draw down or seek reimbursement for any DOE award going forward, including Clean Cities funding, is also untenable. If the City's Department of the Environment cannot draw down on its Clean Cities award, for instance, the Department of the Environment will lose the only funding that supports direct outreach and engagement with small businesses, residents, and small- and medium-sized fleets that lack the resources to purchase electric vehicles. The City will not be able to support work that has allowed it to reduce emissions by 70,000 tons annually or to share best practices on alternative fuel adoption with other jurisdictions to multiply impacts on a regional scale. San Francisco relies on Clean Cities funding to staff positions, conduct outreach, and coordinate the critical infrastructure needed for alternative fuel adoption.

48.　Likewise, the Discrimination Condition, which applies to "all applicable DOE awards" would prevent the City from drawing down or seeking reimbursement for any DOE award going forward. For instance, San Francisco has been awarded a $20 million DOE grant under the Inflation Reduction Act of 2022 to adopt, implement, and enforce Building Performance Standards in San Francisco and Berkeley. Although these funds are not yet available for drawdown, the City will face the same impossible choice if and when they are made available: forgo $20 million in critical public infrastructure funding or certify to the ambiguous Discrimination Condition and its inherent legal risks.

## FIRST CAUSE OF ACTION

### Violation of Separation of Powers

49.　The City realleges and incorporates by reference the allegations of the preceding paragraphs.

50. The Constitution vests Congress—not the Executive—with "[a]ll" of the federal government's "legislative Powers." U.S. Const. art. I, § 1; *id.* § 8, cl. 1; *id.* § 9, cl. 7.

51. The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). "Congress's power to spend is directly linked to its power to legislate. 'Incident to [the spending] power, Congress may attach conditions on the receipt of federal funds . . . .'" *Id.* at 1231–32 (alteration in original) (quoting *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987)).

52. The "executive Power" vested in the President does not include the power to attach conditions on the receipt of federal funds. To the contrary, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *City & Cnty. of San Francisco*, 897 F.3d at 1232 (alteration in original) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

53. Accordingly, absent an express delegation, only Congress, not the Executive Branch, is entitled to attach conditions to federal funds.

54. The separation of the legislative, executive, and judicial powers among the three branches is a central and core tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024) (the separation of powers "doctrine is undoubtedly carved into the Constitution's text by its three articles separating powers"); *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) ("the Constitution's rule vesting federal legislative power in Congress is 'vital to the integrity and maintenance of the system of government ordained by the Constitution'" (quoting *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892))).

55. Consistent with these principles, the Executive Branch acts at the "lowest ebb" of its constitutional power when it "takes measures incompatible with the express or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

56. In leveraging its spending power under the Constitution, Congress has not conditioned the provision of DOE funding on compliance with a prohibition on all forms of DEI policies and initiatives. Nor has Congress delegated to Defendants the authority to attach any such conditions

unilaterally.

57.     By imposing the Discrimination Condition on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without constitutional authorization from Congress and in the absence of statutory authority to do so.

58.     For these reasons, Defendants' conditioning of the drawdown and reimbursement of DOE funds on compliance with the Discrimination Condition violates the constitutional separation of powers.

59.     Defendants' violations have caused harm and will continue to cause harm to the City for which no remedy other than an injunction is adequate.

**SECOND CAUSE OF ACTION**

**Violation of Spending Power**

60.     The City realleges and incorporates by reference the allegations of the preceding paragraphs.

61.     Congress's power to attach conditions to federal funding "is of course not unlimited, but is instead subject to several general restrictions." *Dole*, 483 U.S. at 207. The Discrimination Condition violates at least two of the Constitution's restrictions on the spending power.

62.     First, the spending power requires recipients to have fair and advance notice of conditions that apply to federal funds so that recipients can "voluntarily and knowingly" decide whether to accept the funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously," because recipients "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). As a corollary, the spending power prohibits the federal government from "surprising" grantees "with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

63.     Second, the government may only impose conditions on federal funding that are reasonably related to the federal interest in the project and the project's objectives. *Dole*, 483 U.S. at 207–08; *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord New York v. United States*, 505 U.S. 144, 167 (1992).

64. As discussed in the First Cause of Action, Congress has not delegated authority to Defendants or the Executive to condition DOE grants on recipients' agreement to terms prohibiting DEI statements and policies as conceived by the Administration and illustrated by the July Bondi Memo. But, even if Congress had, the Discrimination Condition would nonetheless be unlawful and unenforceable because, in contravention of the spending power, it is ambiguous, and it is not germane to the purposes of the statute that authorizes the Clean Cities Program, nor any statute that authorizes grants administered by DOE. Each of these flaws applies to the Discrimination Condition.

### a. Ambiguity

65. The Discrimination Condition is ambiguous and unascertainable. As an initial matter, the Discrimination Condition does not define key terms, including "diversity, equity, and inclusion." Moreover, while San Francisco has understood well-settled statutory and judicial interpretations of antidiscrimination laws—and has certified to compliance based on that understanding in the past—the meaning of these terms has been upended by the July Bondi Memo's vague and contradictory guidance and DOJ's threat to pursue False Claims Act litigation against any jurisdiction that pursues policies inconsistent with that guidance. As such, the Discrimination Condition in conjunction at least with the July Bondi Memo prevent any reasonable grantee, including San Francisco, from understanding its scope and meaning and, therefore, from knowingly accepting the condition.

### b. Germaneness

66. The Discrimination Condition is not germane to the purposes of the Clean Cities Program, the Energy Policy Act of 1992 (which authorizes the Clean Cities Program), or the federal interest in the projects funded by the Clean Cities Program, which pertain to energy independence.

67. The Discrimination Condition is likewise not germane to the purpose of any statute or federal interest through which Congress has authorized funding to support national, economic, and energy security.

68. Defendants' violations of the Spending Power have caused harm and will continue to cause harm to San Francisco for which no remedy other than an injunction is adequate.

COMPLAINT
CASE NO.

16

4918-0218-3602

## THIRD CAUSE OF ACTION

### Violation of the Administrative Procedure Act: Arbitrary and Capricious

69.     The City realleges and incorporates by reference each of the allegations of the prior paragraphs as if fully set forth herein.

70.     Defendant DOE is an "agency" as defined in the APA, 5 U.S.C. § 551(1).

71.     Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

72.     Defendants' incorporation of the Discrimination Condition into the Standard Terms and Conditions as requirements for drawdown or reimbursement of DOE grants, including Clean Cities funding, is a final agency action.

73.     Under the APA, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

74.     "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id*. (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co*., 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id*. at 293.

75.     Defendants have provided no reasoned explanation or basis for their decision to incorporate the Discrimination Condition in the Standard Terms and Conditions for DOE awards, which have no reasonable connection or nexus to those issues.

76.     Defendants have ignored essential aspects of the interests they purport to address by incorporating the Discrimination Condition in the Standard Terms and Conditions, including by failing to (a) assess whether the condition is lawful and consistent with the authorizing statute and the Constitution; (b) consider San Francisco's reasonable and inevitable reliance on now at-risk funds; and

COMPLAINT
CASE NO.
4918-0218-3602

(c) consider the potential impacts on public education and alternative fuel infrastructure of withholding the funding appropriated by Congress.

77.     Defendants' violations have caused harm and will continue to cause harm to San Francisco for which no remedy other than an injunction is adequate.

78.     The City therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the inclusion of the Discrimination Condition in the DOE's Standard Terms and Conditions violates the APA because it is arbitrary and capricious; to provide preliminary relief under 5 U.S.C. § 705; to vacate and set aside the Discrimination Condition in Defendants' Standard Terms and Conditions; and to temporarily restrain, and preliminarily and permanently enjoin, Defendants from including the Discrimination Condition in Defendants' Standard Terms and Conditions.

## FOURTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act: Contrary to the Constitution

79.     The City realleges and incorporates by reference the allegations of the preceding paragraphs.

80.     Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

81.     As described above, the Discrimination Condition violates bedrock constitutional provisions and principles, including the spending power and the separation of constitutional powers between and among the President, Congress, and judiciary.

82.     San Francisco therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the inclusion of the Discrimination Condition in DOE's Standard Terms and Conditions violates the APA because it contrary to constitutional rights, powers, privileges, or immunities; to provide preliminary relief under 5 U.S.C. § 705; to vacate and set aside the Discrimination Condition in Defendants' Standard Terms and Conditions; and to temporarily restrain, and preliminarily and permanently enjoin, Defendants from including the Discrimination Condition in Defendants' Standard Terms and Conditions.

83. Defendants' violations have caused harm and will continue to cause harm to San Francisco for which no remedy other than an injunction is adequate.

### FIFTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act: Excess of Statutory Authority

84. The City realleges and incorporates by reference each of the allegations of the prior paragraphs as if fully set forth herein.

85. Under the APA, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law … [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

86. Defendants may exercise only authority granted to them by statute or the Constitution.

87. No law or provision of the Constitution authorizes Defendants to impose extra-statutory conditions not authorized by Congress on congressionally appropriated funds. No statute authorizes DOE to impose the Discrimination Condition on all DOE awards, including the statute under which the Clean Cities Program exists.

88. Defendants' violations have caused harm and will cause harm to San Francisco for which no remedy other than an injunction is adequate.

89. San Francisco therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the inclusion of the Discrimination Condition in DOE's Standard Terms and Conditions violates the APA because it is in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; to provide preliminary relief under 5 U.S.C. § 705; to vacate and set aside the Discrimination Condition in Defendants' Standard Terms and Conditions; and to temporarily restrain, and preliminarily and permanently enjoin, Defendants from including the Discrimination Condition in Defendants' Standard Terms and Conditions.

### PRAYER FOR RELIEF

WHEREFORE, the City requests the Court grant the following relief:

1. A declaration that the Discrimination Condition is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

2.      A declaration that Defendants' attachment and incorporation of the Discrimination Condition and materially similar requirements in any documents incorporated by reference into Defendants' Standard Terms and Conditions is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

3.      An order temporarily restraining and preliminarily and permanently enjoining Defendants from attaching, incorporating, imposing, or enforcing the Discrimination Condition, or any materially similar terms or conditions, with respect to any applications, drawdowns, or reimbursements submitted by San Francisco for Clean Cities funding or any funds awarded to the City by Defendants, whether directly or indirectly;

4.      An order temporarily restraining and preliminarily and permanently enjoining Defendants from attaching, incorporating, imposing, or enforcing the requirement that San Francisco comply with antidiscrimination law as requiring anything other than compliance with such laws as enacted by Congress and interpreted by the judiciary;

5.      An order pursuant to 5 U.S.C. § 705 that: (i) postpones the effective date of any action by any Defendants to adopt, issue, enforce, or implement the Discrimination Condition or any materially similar terms or conditions pending conclusion of this litigation; (ii) declares the Discrimination Condition void and unenforceable with respect to any application, award, agreement, or subagreement, or other document executed by the City that is related to DOE funding; and (iii) declares that the City need only comply with antidiscrimination law as enacted by Congress and interpreted by the judiciary;

6.      An order under 5 U.S.C. § 706 holding unlawful, setting aside, and vacating all actions taken by Defendants to: (i) adopt, issue, enforce, or implement the Discrimination Condition or any materially similar terms or conditions; (ii) require, attach, incorporate, implement, or enforce the Discrimination Condition in any application, award, agreement or subagreement, or general terms and conditions; or (iii) construe the requirements that San Francisco comply with antidiscrimination law in any manner other than how such laws have been enacted by Congress and interpreted by the judiciary;

7.      Orders preliminarily and permanently enjoining Defendants from retaliating against San Francisco for participating in this lawsuit or taking any adverse action based on San Francisco's

participation in this lawsuit, including but not limited to reducing the amount of a grant award to San Francisco or to any state agency through which the City may receive grant funding; refusing to issue, process, sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

8.    An award to the City of its reasonable attorneys' fees, costs, and other expenses; and

9.    Any other and further relief that this Court deems just and proper.

Dated: June 5, 2026

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
CARA R. MEYER
Deputy City Attorney


*/s/ David Chiu*

DAVID CHIU
City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

# EXHIBIT 1



**DOE Standard Terms and Conditions**

## Standard Terms and Conditions
# Laws, Regulations, National Policies, Executive Orders, and Guidance Incorporated by Reference

The following are incorporated into this award by reference:

- Financial Assistance Regulations at 2 CFR Part 200, as adopted and supplemented by 2 CFR Part 910, and subject to deviations issued pursuant to 2 CFR 910.133
- National Policy Requirements (November 12, 2020)
- Recipient's Application for Financial Assistance as approved by DOE
- Notice of Funding Opportunity under which the project was selected (if applicable)
- Research Terms & Conditions (November 12, 2020) and the DOE Agency Specific Requirements (November 12, 2020) at https://www.nsf.gov/awards/managing/rtc.jsp (as applicable)
- Other program regulations at http://www.eCFR.gov (as applicable)

# Applicability of Standard Terms and Conditions

These Standard Terms and Conditions comply with 2 CFR 200.211(c) and provide a common set of financial assistance terms that can be applied to all applicable DOE awards. The Special Terms and Conditions are a companion document to the Standard Terms and Conditions, comply with 2 CFR 200.211(d), and address the unique aspects of a particular award driven by program specific requirements, statutory criteria, risks, or other considerations. Recipients must meet the requirements set forth in both the Standard Terms and Conditions and Special Terms and Conditions, if applicable. In instances where requirements may conflict, the Special Terms and Conditions will take precedence.

Financial Assistance Regulations at 2 CFR Part 200, as adopted and supplemented by 2 CFR 910 (subject to any deviations issued pursuant to eCFR :: 2 CFR 910.133 — Deviation authority) are incorporated into the Standard Terms and Conditions by reference.

In some instances, the terms and conditions reference specific sections of 2 CFR Part 200 and 2 CFR Part 910 to provide clarity regarding their implementation. These references do not replace, limit, or eliminate the applicability of the remaining portions of the Financial Assistance Regulations to the award.

The following tables provide an index of the sections of the regulations. The references in these tables are for convenience and do not replace the recipient's own due diligence in reviewing and complying with these regulations.

| 2 CFR Part 200, "Federal Agency" Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards |
| --- |

 **U.S. DEPARTMENT OF ENERGY**

**DOE Standard Terms and Conditions**

| Subpart | Title | Reference |
|---|---|---|
| A | Acronyms | 2 CFR 200 |
|  | Definitions | 2 CFR 200.1 |
| B | General Provisions | 2 CFR 200.100 - 113 |
| C | Pre-Federal Award Requirements and Contents of Federal Awards | 2 CFR 200.200 - 217 |
| D | Post Federal Award Requirements | 2 CFR 200.300 - 309 |
|  | Property Standards | 2 CFR 200.310 - 316 |
|  | Procurement Standards | 2 CFR 200.317 - 327 |
|  | Performance and Financial Monitoring and Reporting | 2 CFR 200.328 - 330 |
|  | Subrecipient Monitoring and Management | 2 CFR 200.331 - 333 |
|  | Record Retention and Access | 2 CFR 200.334 - 338 |
|  | Remedies for Noncompliance | 2 CFR 200.339 - 343 |
|  | Closeout | 2 CFR 200.344 |
|  | Post -Closeout Adjustments and Continuing Responsibilities | 2 CFR 200.345 |
|  | Collection of Amounts Due | 2 CFR 200.346 |
| E | Cost Principles | 2 CFR 200.400 - 476 |
| F | Audit Requirements | 2 CFR 200.500 - 521 |

| 2 CFR Part 910 "DOE" Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards | | |
|---|---|---|
| **Subpart** | **Title** | **Reference** |
| A | Reserved |  |
| B | General Provisions | 2 CFR 910.120 - 133 |
| C | Reserved |  |
| D | Post Award Federal Requirements for For-Profit Entities | 2 CFR 910.350 - 372 |
|  | Appendix A: Patent and Data Provisions |  |
| E | Cost Principles | 2 CFR 910.401 |
| F | Audit Requirements for For-Profit Entities | 2 CFR 910.500 - 521 |

# Notice Regarding Use of Hyperlinks

Hyperlinks are provided to improve the readability of the terms as a convenience to the recipient.  The hyperlinked citation is applicable and in full effect on the effective date of Award Agreement, (or amended terms and conditions as may be applicable).  If a hyperlink is broken, dead, or orphaned, the referenced regulation remains applicable.



**DOE Standard Terms and Conditions**

# Table of Contents

Laws, Regulations, National Policies, Executive Orders, and Guidance Incorporated by Reference ............... 1

**Applicability of Standard Terms and Conditions** ..................................................................................... 1

**Notice Regarding Use of Hyperlinks** ......................................................................................................... 2

**Table of Contents** ........................................................................................................................................ 3

**I.       Administrative Terms** ..................................................................................................................... 5

    A.       Legal Authority and Effect .................................................................................................... 5
    B.       Recipient Responsibilities ...................................................................................................... 5
    C.       Mandatory DOE Notifications ............................................................................................... 5
    D.       Performance Measurement ..................................................................................................... 7
    E.       Subaward and Contract Requirements ................................................................................... 7
    F.       Funding Availability ............................................................................................................... 8
    G.       National Security: Classifiable Results Originating Under an Award ................................... 8
    H.       Prohibition Against Re-Assignment ...................................................................................... 9
    I.       Compliance with Federal, Tribal, State, and Local Laws ...................................................... 9
    J.       Permits and Approvals ........................................................................................................... 9
    K.       Corporate Felony Conviction and Federal Tax Liability Assurances .................................. 10
    L.       Nondisclosure and Confidentiality Agreements Assurances .............................................. 10
    M.       Pre-Award Information ......................................................................................................... 11
    N.       Termination ........................................................................................................................... 11
    O.       Noncompliance ..................................................................................................................... 12
    P.       Prohibition on the Use of Funds for Activities Related to Federal Acquisition Security Council (FASC)-Prohibited Unmanned Aircraft Systems ......................................................... 12
    Q.       Computer Network Restrictions ........................................................................................... 12

**II.      National Policy Terms** ................................................................................................................. 13

    A.       Terms and Conditions Incorporated by Reference ............................................................... 13
    B.       National Environmental Policy Act ..................................................................................... 13
    C.       Historic Preservation Act ..................................................................................................... 13
    D.       Drug Free Workplace ........................................................................................................... 14
    E.       Nonprocurement Debarment and Suspension ..................................................................... 14
    F.       Implementation of Executive Order 13798, Promoting Free Speech and Religious Liberty ........ 14
    G.       Lobbying ............................................................................................................................... 14
    H.       Fraud, Waste and Abuse ...................................................................................................... 15
    I.       Human Subjects Research .................................................................................................... 15
    J.       Laboratory Animal Welfare Act ........................................................................................... 16
    K.       Build America, Buy America Act (BABA) Requirement ..................................................... 17
    L.       Implementation of Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity ............................................................................................................ 22

**III.     DOE Terms** .................................................................................................................................. 22

    A.       Liability ................................................................................................................................. 22
    B.       Interim Conflict of Interest Policy for Financial Assistance ............................................... 22
    C.       Organizational Conflict of Interest ...................................................................................... 23
    D.       Environmental, Safety and Health Performance of Work at DOE Facilities ...................... 24
    E.       Insolvency, Bankruptcy or Receivership ............................................................................. 24
    F.       Impacted Indian Tribes ........................................................................................................ 25
    G.       Acknowledgement and Disclaimer Language ...................................................................... 25



**DOE Standard Terms and Conditions**

| | | | |
|---|---|---|---|
| IV. | | **Research, Technology, and Economic Security (RTES) Terms** | **26** |
| | A. | RTES Due Diligence Reviews and Monitoring | 26 |
| | B. | Required Risk Mitigation | 27 |
| | C. | Transparency of Foreign Connections | 27 |
| | D. | Foreign Collaboration Considerations | 30 |
| | E. | Research Security Training Requirement | 30 |
| | F. | Digital Persistent Identifiers | 31 |
| | G. | Entity of Concern Prohibition | 31 |
| | H. | Performance of Work in United States (Foreign Work Waiver) | 32 |
| | I. | Export Control | 32 |
| | J. | Malign Foreign Talent Recruitment Program Prohibition | 33 |
| V. | | **Financial Terms** | **33** |
| | A. | Pre-Award Costs | 33 |
| | B. | Cost Share Compliance | 34 |
| | C. | Federal Payment | 34 |
| | D. | Audits | 35 |
| | E. | Conference Spending | 36 |
| | F. | Budget Changes | 36 |
| | G. | Subrecipient Change Notification | 37 |
| VI. | | **Equipment and Real Property Terms** | **38** |
| | A. | Notice Regarding the Purchase of American-Made Equipment and Products – Sense of Congress | 38 |
| | B. | Title to Real Property and Equipment | 38 |
| | C. | Federally Owned Property (Government-Furnished) | 38 |

 **U.S. DEPARTMENT OF ENERGY**

**DOE Standard Terms and Conditions**

# I. Administrative Terms

## A. Legal Authority and Effect

A DOE financial assistance award is valid only if it is in writing and is signed, either in writing or electronically, by a Grants Officer.

The recipient may accept or reject the award. A request to draw down DOE funds or acknowledgement of award documents by the recipient's authorized representative through electronic systems used by DOE, specifically FedConnect, constitutes the recipient's acceptance of the terms and conditions of this award. Acknowledgement via FedConnect by the recipient's authorized representative constitutes the recipient's electronic signature.

## B. Recipient Responsibilities

By accepting the award, the recipient accepts responsibility for administration of the award consistent with federal statutes, regulations, and the terms and conditions of the award.

The recipient must promptly notify DOE of any significant developments relating to the administrative, programmatic, technical, environmental, financial aspects, etc. of the award as well as any incident associated with the project (positive or negative) that has the potential for high visibility in the media. Please see Mandatory DOE Notifications for specifics.

## C. Mandatory DOE Notifications

Recipients must promptly notify DOE in writing to the Grants Officer, Specialist, and Federal Project Manager for your award as identified in the Assistance Agreement should any of the instances described below occur during the course of your DOE financial assistance award.

| Description of Notification Requirements | Location |
|---|---|
| Any fatality, injury, or illness that results in loss of consciousness or requires medical treatment beyond first aid involving an employee, or member of the public, resulting in any way from the performance of this award. | Standard Terms, "Liability" |
| Refusal of a subrecipient to accept flow down requirements within 5 business days of refusal. | Standard Terms, "Subaward and Contract Requirements" |
| Any incident arising out of or relating to work under the award that has the potential for high visibility in the media upon occurrence. | Standard Terms, "Recipient Responsibilities" |
| Any violations of Federal, State, Tribal, and local laws (i.e., environmental, health, safety, or labor laws and regulations) arising out of or relating to work under the award upon occurrence. | Standard Terms, "Compliance with Federal, Tribal, State, and Local Laws" |
| Any notices or claims of patent or copyright infringement arising out of or relating to the performance of the DOE award upon occurrence. | Award Attachments, "Intellectual Property Provisions" |

 **U.S. DEPARTMENT OF ENERGY**

**DOE Standard Terms and Conditions**

| Description of Notification Requirements | Location |
|---|---|
| Significant problems relating to the administrative, programmatic, technical, environmental (i.e., compliance with permits, etc.), or financial aspects of the award immediately upon occurrence. | Standard Terms, "Recipient Responsibilities" |
| Any noncompliance with approved Federal, Tribal, State, and Local permits, licenses, authorizations, and approvals upon occurrence. | Standard Terms, "Permits and Approvals" |
| Any adverse environmental event that significantly impacts social, cultural, economic, and natural resources (i.e., any significant environmental permit violation, incident which causes a significant process or hazard control system failure, environmental contamination or the need for environmental cleanup) immediately upon occurrence. | Standard Terms, "National Environmental Policy Act" |
| Any information arising during the award that may require classification immediately and no later than five (5) days. | Standard Terms, "National Security: Classifiable Results Originating Under an Award" |
| Any information alleging a violation of a prohibition identified in 2 CFR 175.105(a) immediately upon occurrence. | Standard Terms, "Terms and Conditions Incorporated by Reference" |
| Any employee under the award convicted for a violation of a criminal drug statute within ten (10) calendar days of occurrence in accordance with 2 CFR 182.225(a). | Standard Terms, "Drug Free Workplace" |
| Any violations of the lobbying restrictions in the award upon occurrence. | Standard Terms, "Lobbying" |
| Any information regarding fraud, waste, abuse, or mismanagement immediately upon occurrence to the Office of the Inspector General. | Standard Terms, "Fraud, Waste and Abuse" |
| Significant negative developments such as problems, delays, or adverse conditions identified in accordance with 2 CFR 200.329(e) at least 20 working days prior to occurrence or as known.  This notification also includes positive developments such as meeting milestones early, cost savings, etc., and any developments impacting performance of commitments made under 200.318(i). | Special Terms, "Federal Stewardship" |
| Insolvency, bankruptcy, receivership, or an audit determination that the company may not proceed as a going concern immediately and no later than 5 days. | Standard Terms, "Insolvency, Bankruptcy or Receivership" |
| Plans for Tribal interactions in sufficient time to determine the need for DOE participation prior to such interactions. | Standard Terms, "Impacted Indian Tribes" |
| Confirmation or belief that an owner of the recipient, owner of a subrecipient, or individual on the project team is participating in a Malign Foreign Talent Recruitment Program within five (5) business days of learning of the participation. | Special Terms, "Malign Foreign Talent Recruitment Program Prohibition" |
| Participation in the project by an Entity of Concern immediately upon occurrence. | Standard Terms, "Entity of Concern Prohibition" |
| Export control investigations, indictments, charges, convictions, and violations at the recipient or subrecipient level immediately upon occurrence. | Standard Terms, "Export Control" |



**DOE Standard Terms and Conditions**

| Description of Notification Requirements | Location |
|---|---|
| Any loss, damage, or theft of equipment that will have an impact on the program at the recipient or subrecipient within fifteen (15) business days of occurrence. | 2 CFR 200.313(d)(3) |
| Any specific conditions as described in 2 CFR 200.208 planned to be placed on a subaward prior to contractual execution. | 2 CFR 200.332(d) |
| Any conditions identified in the Transparency of Foreign Connections Term within fifteen (15) business days of the planned interactions or learning of a previously undisclosed interaction or equipment covered under this Term. | Standard Terms, "Transparency of Foreign Connections" |
| Any improper claims or excess payments arising out of or relating to work under the award immediately upon occurrence. | Standard Terms, "Federal Payment" |
| Any violations of the cost share requirements under the award upon occurrence. | Standard Terms, "Cost Share Compliance" |
| Inability of the recipient to meet its cost sharing obligations immediately upon occurrence. | Standard Terms, "Cost Share Compliance" |

# D. Performance Measurement

In accordance with 2 CFR 200.301, the recipient's progress in achieving the goals, targets, objectives, outcomes, schedule, and plans included within the full suite of award documents (including attachments) in addition to those delivered in accordance with award Attachment, Federal Assistance Reporting Checklist, will be assessed during the project period to evaluate achievement of program goals and objectives.

# E. Subaward and Contract Requirements

The recipient agrees to apply the terms and conditions of this award, including the Intellectual Property Provisions, to any subrecipients except for DOE National Laboratories, (and contractors, as appropriate) where applicable.  Consistent with 2 CFR 200.101(b), 2 CFR 200.327 (Appendix II to Part 200), and 2 CFR 200.332.  For the purposes of the subaward(s) to a DOE National Laboratory, the recipient shall use an agreement consistent with the terms of the Management and Operating (M&O) Contract of the Laboratory (e.g., Strategic Partnership Projects or CRADA).  Such agreements that are approved by the M&O Contracting Officer, in consultation with the DOE Patent Counsel, shall be considered compliant with the flow down requirements of the terms and conditions of this award.  The recipient should consult with the Grants Officer on the applicability of this flow down requirement to Federally Funded Research and Development Centers (FFRDCs).

Recipients that enter into subawards must execute a legally binding written agreement with the subrecipient, regardless of the value of the award.  This agreement must incorporate all the applicable terms and conditions of this award, including any applicable Special Award Conditions, and must include the information at 2 CFR 200.332(b).  The recipient must perform all responsibilities required of a pass-through entity, as specified at 2 CFR 200.332, including but not limited to monitoring use of awarded funds and compliance with all terms and conditions;



**DOE Standard Terms and Conditions**

following up on any deficiencies identified as a result of onsite or desk reviews and/or audits; and reviewing and correcting as necessary all subrecipient performance and financial reporting before including this information on the recipient's required reports.

Recipients must verify that a proposed subrecipient is not excluded or disqualified from receiving or participating in federal awards prior to making a subaward to the proposed subrecipient by checking SAM.gov and documenting the results of the search. The recipient must evaluate and document each subrecipient's risk of noncompliance with federal statutes, regulations, and the terms and conditions of the subaward for purposes of determining the appropriate subrecipient monitoring strategy, as described in 2 CFR 200.332(c).

The recipient must monitor the subrecipient's use of federal funds through reporting, site visits, regular contact, or other means to provide reasonable assurance that the subrecipient is administering the subaward in compliance with award requirements and to ensure that the scope of work is being appropriately carried out and milestones are achieved. The recipient must, if necessary, take appropriate enforcement actions against noncompliant subrecipients. The recipient must promptly notify DOE of any subrecipient refusal to accept flow down provisions or prior to implementation of any special conditions in subrecipient agreements.

## F. Funding Availability

Funding not obligated at the time of award and funding for any future budget periods is subject to availability of funds, program authority, satisfactory performance, the project continuing to support DOE's programmatic goals, economic viability and compliance with the award terms and conditions.

If the award is a single performance period and the federal share is fully obligated, DOE will have fulfilled its maximum award funding obligation.

## G. National Security: Classifiable Results Originating Under an Award

DOE does not expect that the results of the project will involve classified information. Under certain circumstances, however, a classification review of information originated under the award may be required. DOE may review work under this award at any time to determine if it requires classification.

Some information concerning scientific, technological, economic matters, or other matters relating to national security or cryptology may arise during the award and require classification. If the recipient originates information during the course of this award that the recipient believes requires classification, the recipient must immediately and no later than 5 days from the identification of the concern:

1. Notify the Federal Project Manager and the Grants Officer; and



**DOE Standard Terms and Conditions**

2. Submit the information by registered mail directly to the Director, Office of Classification and Information, SO-10.2; U.S. Department of Energy; P.O. Box A; Germantown, MD 28075-0963, for classification review; and
3. Restrict access to the information to the maximum extent possible until the recipient is informed that the information is not classified, but no longer than 60 days after receipt by the Director, Office of Classification and Information Control.

If DOE determines any of the information requires classification, the recipient agrees that the DOE may modify or terminate the award with consent of the recipient in accordance with 2 CFR 200.340(a)(3) or (4). All material deemed to be classified must be forwarded to DOE in a manner specified by DOE. If DOE does not respond within the specified time periods, the recipient is under no further obligation to restrict access to the information.

Any award activities anticipated to involve production or use of special nuclear material (i.e., plutonium, uranium enriched in the isotope 233 or 235, and any other material so determined under Section 51 of the Atomic Energy Act) or nuclear energy, are unallowable until such time as the Grants Officer provides prior approval. See "Prior Approval" term in the Special Terms and Conditions.

## H. Prohibition Against Re-Assignment

Except as otherwise provided by Federal statute, the recipient must not transfer, pledge, mortgage, assign, encumber or hypothecate this award, or any rights to, interests therein or claims arising thereunder, to any party or parties, including but not limited to banks, trust companies, other financing or financial institutions, or any other public or private organizations or individuals without the express prior written approval of the Grants Officer. See "Prior Approval" term in the Special Terms and Conditions.

## I. Compliance with Federal, Tribal, State, and Local Laws

The recipient must comply with all applicable Federal, Tribal, State, and Local Laws and regulations for all activities performed under this award.

The recipient must notify DOE of any impending or actual violations of any Federal, Tribal, State, or Local Laws or the award terms and conditions (to include all award attachments).

Any apparent inconsistency between federal statutes and regulations and the Terms and Conditions contained in this award must be referred to the Specialist and Federal Project Manager as identified in the Assistance Agreement for this award for guidance.

## J. Permits and Approvals

The recipient is required to obtain and maintain all applicable Federal, Tribal, State, and Local permits, licenses, authorizations, and approvals for activities under this award.

 **U.S. DEPARTMENT OF ENERGY**                **DOE Standard Terms and Conditions**

The recipient must immediately notify DOE of noncompliance with any approved Federal, Tribal, State, and Local permits, licenses, authorizations, and approvals issued for activities under the award.

# K. Corporate Felony Conviction and Federal Tax Liability Assurances

In accordance with Sections 744 and 745 of Division E of the Consolidated and Further Continuing Appropriations Act of 2015 (Pub. L. No. 113-235), recipients organized as corporations are prohibited from receiving a DOE financial assistance award if the organization has an unpaid federal tax liability or has been convicted of a felony criminal violation under federal law in the 24 months preceding the award date.

A corporation includes any entity that has filed articles of incorporation in any of the 50 states, the District of Columbia, or the various territories of the United States, but not foreign corporations. It includes both for-profit and non-profit organizations.

By entering into this award, the recipient attests that its corporation has not been convicted of a felony criminal violation under federal law in the 24 months preceding the date of signature and further attests that its corporation does not have any unpaid federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

# L. Nondisclosure and Confidentiality Agreements Assurances

The following attestation is required for compliance with Section 747 of Division E of the Consolidated and Further Continuing Appropriations Act of 2015 (Pub. L. No. 113-235).

By entering into this agreement, the recipient attests that it **does not and will not** require its employees or contractors to sign internal nondisclosure or confidentiality agreements or statements prohibiting or otherwise restricting its employees or contractors from lawfully reporting waste, fraud, or abuse to a designated investigative or law enforcement representative of a federal department or agency authorized to receive such information.

The recipient further attests that it **does not and will not** use any federal funds to implement or enforce any nondisclosure and/or confidentiality policy, form, or agreement it uses unless it contains the following provisions:

1. These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive Order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by



**DOE Standard Terms and Conditions**

controlling Executive Orders and statutory provisions are incorporated into this agreement and are controlling.

2. The limitation above shall not contravene requirements applicable to Standard Form 312 - Classified Information Nondisclosure Agreement, Standard Form 4414 – (U) Sensitive Compartmented Information Nondisclosure Agreement, or any other form issued by a federal department or agency governing the nondisclosure of classified information.

3. Notwithstanding the provision listed in paragraph (a), a nondisclosure or confidentiality policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used.  Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure or confidentiality forms shall also make it clear that they do not bar disclosures to Congress, or to an authorized official of an executive agency or the Department of Justice, that are essential to reporting a substantial violation of law.

## M.    Pre-Award Information

Prior to award, the recipient was required to provide certain information, disclosures, representations, and certifications.  Certification of the information was required by the recipient's authorized representative on behalf of the recipient, via the pre-award information sheet.  If there are any changes to the provided information, disclosures, representations, and/or certifications throughout the life of the award, the recipient must notify the Grants Officer, in writing, within fifteen (15) business days of the changes, unless a different notification period is specified in an applicable law or controlling term, in which case the specific period controls.

## N. Termination

In accordance with 2 CFR 200.340 the award may be terminated in part or its entirety as follows:

(1) By the Federal Agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

(2) By the Federal Agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated;

(3) By the recipient or subrecipient upon sending the Federal Agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated.  However, if the Federal Agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal Agency or pass-through entity may terminate the Federal award in its entirety; or



**DOE Standard Terms and Conditions**

(4) By the Federal Agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.  The program goals and agency priorities include, but are not limited to, the objectives specified in the Notice of Funding Opportunity under which the project was selected (if applicable).

## O. Noncompliance

If the recipient fails to comply with Federal statutes, regulations or the Standard or Special terms and conditions of the award, the Grants Officer may take appropriate action in accordance with 2 CFR 200.339 including, but not limited to, withholding payments, disallowing costs, suspending or terminating the award, or initiating suspension and debarment proceedings.

The Grants Officer will notify the recipient of DOE's determination that an instance of noncompliance has occurred, provide details regarding the instance of noncompliance, and indicate a proposed remedy.  The recipient will have up to 30 calendar days to respond and provide information and documentation contesting the determination or suggesting an alternative remedy.  The Grants Officer will consider any and all information provided by the recipient and issue a final determination in writing, which will state DOE's findings regarding noncompliance and the remedy to be imposed.

## P. Prohibition on the Use of Funds for Activities Related to Federal Acquisition Security Council (FASC)-Prohibited Unmanned Aircraft Systems

Pursuant to the prohibition in section 1825 of the American Security Drone Act of 2023 (Public Law 118-31), on or after December 22, 2025, the following prohibition applies to the use of funds provided through this award:

(1) **Definition** - The terms "FASC-prohibited unmanned aircraft system" and "unmanned aircraft system" have the definitions provided in 48 CFR 40.201, or successor regulation.
(2) **Prohibition** – No Federal funds awarded through this award may be used by a recipient or subrecipient:
(i) To procure a FASC-prohibited unmanned aircraft system; or
(ii) In connection with the operation of a FASC-prohibited unmanned aircraft system.

## Q. Computer Network Restrictions

The recipient shall not expend any Federal funds to maintain or establish a computer network unless such network blocks the viewing, downloading, and exchanging of pornography. This prohibition does not apply when carrying out criminal investigations, prosecution, or adjudication activities.



**DOE Standard Terms and Conditions**

# II.   National Policy Terms

## A. Terms and Conditions Incorporated by Reference

In accordance with the requirements below, the following are incorporated into the award to the extent identified with the same force and effect as though fully set forth herein.

| Regulation | Requirement |
|---|---|
| 2 CFR 25.220 | System for Award Management (SAM.gov) and Universal Identifier Requirements |
| 2 CFR 170.220 | Reporting Subaward and Executive Compensation |
| 2 CFR 175.200 | Trafficking in Persons |
| Appendix XII to 2 CFR 200, Section I(a)(1) | Reporting of Matters Related to Recipient Integrity and Performance |

The recipient must immediately notify DOE of information alleging a violation of a prohibition identified in 2 CFR 175.105(a) and any employee under the award convicted of a criminal drug statute violation in accordance with 2 CFR 182.225(a).

## B. National Environmental Policy Act

DOE must comply with the National Environmental Policy Act ("NEPA"), 42 USC 4321 et seq.  and NEPA implementing procedures at 10 CFR 1021 prior to authorizing the expenditure of Federal funds.  Specifically, DOE is required to assess the impact of the activities authorized under this award on the human environment prior to authorizing project activities and associated project costs.  The recipient is required to provide any information, documents, site access, or other assistance requested by DOE to complete the NEPA review.

Any project activity that has not received a written National Environmental Policy Act (NEPA) determination authorizing tasks, activities, or associated costs are unallowable until such time as the Grants Officer provides approval.

The recipient must immediately notify DOE of any adverse environmental event that significantly impacts social, cultural, economic, and natural resources (i.e., any significant environmental permit violation, incident which causes a significant process or hazard control system failure, environmental contamination or the need for environmental cleanup) immediately upon occurrence.

## C. Historic Preservation Act

**State Energy Program and Weatherization Assistance Program awards should refer to the Historic Preservation Act Term in the Special Terms and Conditions of their award.**

DOE must comply with the National Historic Preservation Act ("NHPA"), 54 USC § 306108 et seq., which requires federal agencies to consider the effects of undertaking (federally funded or assisted projects and activities) on historic properties that are listed in or eligible for

**U.S. DEPARTMENT OF ENERGY**

**DOE Standard Terms and Conditions**

listing in the National Register of Historic Places prior to the expenditures of federal funds.  The recipient is required to cooperate with DOE in its compliance with the requirements of Section 106 of the NHPA.  The recipient may not alter any structure or site, including any groundbreaking for any purpose, prior to the resolution of the NHPA process.  The requirements of this part are applicable to activities funded under the award and shall be coordinated in conjunction with DOE and, as appropriate, other federal agencies, the State Historic Preservation Officer or Tribal Historic Preservation Officer, Tribal representatives, and consulting parties.

The recipient may not alter any structure or site, including any groundbreaking for any purpose, prior to the resolution of the NHPA process.  The tasks and costs are unallowable until such time as the Grants Officer provides prior approval.  See "Prior Approval" term in the Special Terms and Conditions.

## D. Drug Free Workplace

In compliance with 2 CFR 182.20, the DOE has adopted the OMB guidance in 2 CFR 182 Subparts A through F, as the Department's policies and procedures for the drug-free workplace requirements.  Recipients must comply with 2 CFR 182 Subpart B and 2 CFR 182 Subpart C regarding requirements for a drug free workplace.

## E. Nonprocurement Debarment and Suspension

In compliance with 2 CFR 180.20, the DOE has adopted the OMB guidance in 2 CFR Part 180 Subpart A (and as supplemented by 2 CFR Part 601) as the DOE's policies and procedures for non-procurement debarment and suspension.  Recipients must comply with 2 CFR 180 Subpart C regarding transactions when doing business with other participants.

## F. Implementation of Executive Order 13798, Promoting Free Speech and Religious Liberty

In accordance with Executive Order 13798, states, local governments, or other public entities may not condition subawards in a manner that would discriminate or disadvantage subrecipients based on their religious character.

## G. Lobbying

By accepting funds under this award, the recipient agrees that none of the funds obligated on the award shall be expended, directly or indirectly, to influence congressional action on any legislation or appropriation matters pending before Congress, other than to communicate to Members of Congress as described in 18 U.S.C. § 1913.  This restriction is in addition to those prescribed elsewhere in statute and regulation.  See also 2 CFR 200.450.

The recipient must immediately notify DOE of any violations of the lobbying restrictions upon occurrence.

**U.S. DEPARTMENT OF ENERGY**                    **DOE Standard Terms and Conditions**

## H. Fraud, Waste and Abuse

The mission of the DOE Office of Inspector General (OIG) is to strengthen the integrity, economy and efficiency of DOE's programs and operations including deterring and detecting fraud, waste, abuse, and mismanagement.  The OIG accomplishes this mission primarily through investigations, audits, and inspections of Department of Energy activities to include grants, cooperative agreements, loans, and contracts.  The OIG maintains a Hotline for reporting allegations of fraud, waste, abuse, or mismanagement.  To report such allegations, please visit the OIG Hotline.

Additionally, the recipient must be cognizant of the requirements of 2 CFR 200.113 Mandatory Disclosures, which states:

An applicant, recipient, or subrecipient of a federal award must promptly disclose whenever, in connection with the federal award (including any activities or subawards thereunder), it has credible evidence of the commission of a violation of federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. 3729–3733).  The disclosure must be made in writing to the Federal Agency, the agency's Office of Inspector General, and pass-through entity (if applicable).  Recipients and subrecipients are also required to report matters related to recipient integrity and performance in accordance with Appendix XII of this part.  Failure to make required disclosures can result in any of the remedies described in 200.339.  (See also 2 CFR part 180, 31 U.S.C. 3321, and 41 U.S.C. 2313.)

## I.  Human Subjects Research

Award activities involving human subjects, biospecimens, or identifiable private information research are subject to the requirements of 45 CFR 46, Protection of Human Subjects (subpart A which is referred to as the "Common Rule"), 10 CFR 745, Protection of Human Subjects, and DOE Order 443.1C, Protection of Human Research Subjects.

The Federal regulation and the DOE Order require review by an Institutional Review Board (IRB) of all proposed human subjects research projects.  The IRB is an interdisciplinary ethics board responsible for ensuring that the proposed research is sound and justifies the use of human subjects or their data; the potential risks to human subjects have been minimized; participation is voluntary; and clear and accurate information about the study, the benefits and risks of participating, and how individuals' data/specimens will be protected/used, is provided to potential participants for their use in determining whether or not to participate.

Any project activities that involve tasks such as interactions with humans in some way (e.g., through surveys); analysis of their identifiable data (e.g., demographic data and energy use over time); asking individuals to test devices, products, or materials developed through research; and/or testing of commercially available devices in buildings/homes in which humans will be present, etc. (Human Subject Research) are unallowable until such time as the Grants Officer provides prior approval.  See "Prior Approval" term in the Special Terms and Conditions.



**DOE Standard Terms and Conditions**

The prior approval request must include:

1) A registration and a Federalwide Assurance of compliance accepted by the Office of Human Research Protection (OHRP) in the Department of Health and Human Services; and
2) Certification that the research has been reviewed and approved by an Institutional Review Board (IRB) provided for in the assurance. IRB review may be accomplished by the awardee's institutional IRB; by the Central DOE IRB; or if collaborating with one of the DOE national laboratories, by the DOE national laboratory IRB.

The recipient is responsible for ensuring all subrecipients comply and for reporting information on the project annually to DOE Human Subjects Research Database (HSRD). *Note:* If a DOE IRB is used, no end of year reporting will be needed.

Additional information on the DOE Human Subjects Protection Program.

# J. Laboratory Animal Welfare Act

Any project activities involving research on vertebrate animals must comply with the Laboratory Animal Welfare Act of 1966, as amended (7 U.S.C. 2131 et. seq.) and the regulations promulgated thereunder by the Secretary of Agriculture (9 CFR Subchapter A, Parts 1, 2, 3, and 4 (Animal Welfare)) pertaining to the care, handling, and treatment of vertebrate animals held or used for research, teaching, or other activities supported by federal awards. The recipient must ensure that the guidelines described in the Department of Health and Human Services (DHHS) Publication No. (NIH) 86-23, Guide for the Care and Use of Laboratory Animals, (or succeeding revised editions) are followed and comply with the 'U.S. Government Principles for the Utilization and Care of Vertebrate Animals Used in Testing, Research, and Training' (included as an Appendix to the NIH Guide).

Project activities involving research on vertebrate animals are unallowable until such time as the Grants Officer provides prior approval. See "Prior Approval" term in the Special Terms and Conditions. The prior approval request must include the following.

| Research Location | Deliverable |
|---|---|
| Domestic Entities Performing Tasks Inside and Outside the United States as well as Foreign Entities Performing Tasks Inside the United States | Institutional Animal Care and Use Committee (IACUC) approval date and the Animal Welfare Assurance Number |
| Foreign Entities Performing Tasks Outside the United States | Statement of Compliance with Standards for Humane Care and Use of Laboratory Animals by Foreign Institutions Conducting Animal Research Outside the United States |



**DOE Standard Terms and Conditions**

# K. Build America, Buy America Act (BABA) Requirement

**Applicable to awards made after 5/14/2022 as indicated in block 7 of the Assistance Agreement where the project includes construction, alteration, maintenance, and/or repair of public infrastructure in the United States. This term is applicable to existing awards (even if they did not previously include it) if additional funds are provided in a modification executed on or after 5/14/22. See DOE Policy Flash 2025-56. Note that this term *does not* apply if the prime recipient is a for-profit entity.**

## 1. Definitions

There are several terms of art that are given specific definitions with respect to the application and execution of BABA. **Full definitions of these terms can be found by following this hyperlink to the relevant section (2 CFR 184.3) of the Code of Federal Regulations**. Any additional context not present in the Code of Federal Regulations definition for a given term is provided below.

a. *Buy America Preference* (Sometimes also referred to as the **Buy America Requirement** or **Domestic Content Procurement Preference**). Note that, despite the use of the word "Preference," this is very much a mandatory compliance requirement. The statute, implementing regulations, and OMB guidance characterize this requirement as the "Buy America Preference," and so that terminology is reflected here to ensure consistency with the statute and existing guidance.
b. *Component*
c. *Construction materials*
d. *Infrastructure project*
e. *Iron or steel products*
f. *Manufactured products*
g. *Manufacturer*
h. *Predominantly of iron or steel or a combination of both*
i. *Produced in the United States* (Sometimes also referred to as the "Domestic Production requirement")
j. Section 70917(c) *Materials* (i.e., certain materials used in construction that are specifically excluded from being categorized as "construction materials"; as such, the Buy America Preference is not applied to these materials.

Additionally, the following terms are not defined in 2 CFR 184.3, but are important for a proper understanding of BABA and its application:

k. *Project* – means the construction, alteration, maintenance, or repair of public infrastructure in the United States.
l. *Infrastructure* – Infrastructure includes, at a minimum: the structures, facilities, and equipment for roads, highways, and bridges; public transportation; dams, ports, harbors, and other maritime facilities; intercity passenger and freight railroads; freight and intermodal facilities; airports; water systems, including drinking water and wastewater systems; electrical transmission facilities and systems; utilities; broadband infrastructure;

 **U.S. DEPARTMENT OF ENERGY**                    **DOE Standard Terms and Conditions**

buildings and real property; and structures, facilities, and equipment that generate, transport, and distribute energy, including electric vehicle (EV) charging.

m. *Public infrastructure* – The Buy America Preference does not apply to non-public (private) infrastructure.  For purposes of compliance with BABA, infrastructure should be considered "public" if it is:

(1) publicly owned (owned, operated, funded and managed, in whole or in part, by any unit or authority of a Federal, State, or Local government-including U.S. Territories and Indian Tribes); or

(2) privately owned but utilized primarily for a public purpose.  Infrastructure should be considered to be "utilized primarily for a public purpose", and therefore "public", if it is privately owned but operated on behalf of the public or is a place of public accommodation.

## 2. Buy America Requirement

Subject to any applicable waiver, none of the funds provided under this award (federal share or recipient cost-share) may be used for a project for infrastructure unless all iron, steel, manufactured products, and/or construction materials are "produced in the United States." Standards to satisfy this requirement differ based on the category a given material falls under:

a.  All iron and steel used in the project is produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

b.  All manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation.  (**Note:** 2 CFR 184.5 provides specific guidance for determining the cost of components for manufactured products); and

c.  All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. (**Note:** 2 CFR 184.6 provides additional standards that must be satisfied for some specified construction materials in order for those materials to be considered "produced in the United States").

Recipients are responsible for administering their award in accordance with the terms and conditions, including the Buy America Preference.  The recipient must ensure that the Buy America Preference flows down to all subawards and that the subawardees and subrecipients comply with the Buy America Preference.  The Buy America Preference term and condition must be included in all subawards, contracts, subcontracts, and purchase orders for work performed under the infrastructure project.

 **U.S. DEPARTMENT OF ENERGY**

**DOE Standard Terms and Conditions**

*How should a recipient determine which items purchased/used in the project must comply with the "produced in the United States" standard (aka the Domestic Production Requirement)?*

Only items that are consumed in, incorporated into, or permanently affixed to the infrastructure in the project are required to meet the "produced in the United States" requirements. As such, this requirement does not apply to tools, equipment, and supplies - such as *temporary* scaffolding - brought into the construction site and removed at or before the completion of the infrastructure project. This is likewise applicable to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

The Domestic Production requirement only applies to the iron or steel products, manufactured products, and construction materials used for the construction, alteration, maintenance, or repair of public infrastructure in the United States when those items are consumed in, *incorporated* into, or permanently affixed to the infrastructure. An article, material, or supply incorporated into an infrastructure project should not be considered to fall into multiple categories but rather must meet the Buy America Preference Requirement for only the single category in which it was classified.

Section 70917(c) Materials are cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives as provided in Section 70917(c) of BABA. Section 70917(c) materials are excluded from the definition of Construction materials. Asphalt concrete pavement mixes are typically composed of asphalt cement (a binding agent) and aggregates such as stone, *sand*, and gravel. Accordingly, asphalt is also excluded from the definition of Construction materials.

Section 70917(c) materials, on their own, are not manufactured products. Further, Section 70917(c) materials should not be considered manufactured products when they are used at or combined proximate to the work site—such as is the case with wet concrete or hot mix asphalt brought to the work site for incorporation. However, certain Section 70917(c) materials (such as stone, sand, and gravel) may be used to produce a manufactured product, such as is precast concrete. Precast concrete is made of components, is processed into a specific shape or form, and is in such state when brought to the work site. Furthermore, wet concrete should not be considered a manufactured product if not dried or set prior to reaching the work site.

Further clarification is provided in 2 CFR 184 on the circumstances under which a determination is made that Section 70917(c) materials should be treated as components of a manufactured product. That determination is based on consideration of: (i) the revised definition of the "manufactured products" at 2 CFR 184.3; (ii) a new definition of "Section 70917(c) materials" at 2 CFR 184.3; (iii) new instructions at 2 CFR 184.4(e) on how and when to categorize articles, materials, and supplies; and (iv) new instructions at 2 CFR 184.4(f) on how to apply the Buy America preference by category.

**U.S. DEPARTMENT OF ENERGY**                    **DOE Standard Terms and Conditions**

## 3.  Certification of Compliance

Recipients must certify or provide equivalent documentation for proof of compliance that a good faith effort was made to solicit bids for domestic products used in the infrastructure project under this award.

In general, certifications of BABA compliance from a given manufacturer should include the following, at a minimum:

- A listing of all products covered by the certification, including their category (e.g., iron, steel, manufactured product, or construction material);
- A recitation of the relevant "produced in the United States" standard for any categories (iron, steel, manufactured product, or construction material) provided in the above list, to ensure the manufacturer properly understands the standards to be met;
- A clear statement that the products listed meet the relevant "produced in the United States" standard(s); and
- A signature from an authorized representative of the manufacturer certifying the contents of the compliance statement.

Recipients must also maintain certifications or equivalent documentation for proof of compliance that those articles, materials, and supplies that are consumed in, incorporated into, affixed to, or otherwise used in the infrastructure project, not covered by a waiver or exemption, are produced in the United States.  The certification or proof of compliance must be provided by the suppliers or manufacturers of the iron, steel, manufactured products and construction materials and flow up from all subawardees, contractors and vendors to the recipient.  Recipients must keep these certifications with the award/project files and be able to produce them upon request from DOE, auditors or Office of Inspector General.

## 4.  Waivers

When necessary, recipients may apply for, and DOE may grant, a waiver from the Buy America Preference.  Requests to waive the application of the Buy America Preference must be in writing to the Grants Officer.  Waiver requests are subject to review by DOE and the Office of Management and Budget, as well as a public comment period of no less than 15 calendar days.

Waivers must be based on one of the following justifications:

a. Public Interest—Applying the Buy America Preference would be inconsistent with the public interest;
b. Non-Availability—The types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or
c. Unreasonable Cost—The inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

Requests to waive the Buy America Requirement must include the following:
- Waiver type (Public Interest, Non-Availability, or Unreasonable Cost);



**U.S. DEPARTMENT OF ENERGY**

**DOE Standard Terms and Conditions**

- Recipient name and Unique Entity Identifier (UEI);
- Award information (Federal Award Identification Number, Assistance Listing number);
- A brief description of the award project objectives, location, and the specific infrastructure project involved;
- Total estimated DOE financial assistance award value, inclusive of recipient cost share;
- Total estimated infrastructure costs (estimated costs of the Iron, Steel, Manufactured Products and Construction Materials being purchased under the award and utilized in the infrastructure project);
- List and description of iron or steel item(s), manufactured goods, and/or construction material(s) the recipient seeks to waive from the Buy America Preference, including name, cost, quantity(ies), country(ies) of origin, and relevant Product Service Codes (PSC) and North American Industry Classification System (NAICS) codes for each;
- A detailed justification as to how the non-domestic item(s) is/are essential the project;
- A certification that the recipient made a good faith effort to solicit bids for domestic products supported by terms included in requests for proposals, contracts, and non-proprietary communications with potential suppliers;
- A justification statement—based on one of the applicable justifications outlined above—as to why the listed items cannot be procured domestically, including the due diligence performed (e.g., market research, industry outreach, cost analysis, cost-benefit analysis) by the recipient to attempt to avoid the need for a waiver.  This justification may cite, if applicable, the absence of any Buy America-compliant bids received for domestic products in response to a solicitation;
- A description of the market research conducted that includes who conducted the market research, when it was conducted, sources that were used, and the methods used to conduct the research; and
- Anticipated impact to the project if no waiver is issued.

The recipient should consider using the following principles as minimum requirements contained in their waiver request:

- *Time-limited*: Consider a waiver constrained principally by a length of time, or phased-out over time, rather than by the specific project/award to which it applies.  Waivers of this type may be appropriate, for example, when an item that is "non-available" is widely used in the project.  When requesting such a waiver, the recipient should identify a reasonable, definite time frame (e.g., no more than one to two years) designed so that the waiver is reviewed to ensure the condition for the waiver ("non-availability") has not changed (e.g., domestic supplies have become more available).
- *Targeted*: Waiver requests should apply only to the item(s), product(s), or material(s) or category(ies) of item(s), product(s), or material(s) as necessary and justified.  Waivers should not be overly broad as this will undermine domestic preference policies.
- *Conditional*: The recipient may request a waiver with specific conditions that support the policies of IIJA/BABA.

Waiver Requests may be submitted utilizing BABA Waiver Form (gsa.gov), Optional Form 2211 (OF2211) or any other format to provide the required information for the project-specific waiver request.  DOE may request, and the recipient must provide, additional



**DOE Standard Terms and Conditions**

information for consideration of this wavier.  DOE may reject or grant waivers in whole or in part depending on its review, analysis, and/or feedback from OMB or the public.  DOE's final determination regarding approval or rejection of the waiver request may not be appealed.  The waiver request review and public comment process required for a waiver determination can take up to 65 calendar days.

## L. Implementation of Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity

It is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work.  All recipients must comply in all respects with all applicable federal anti-discrimination laws.  Compliance with such Federal laws is material to DOE's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.  By requesting a drawdown or reimbursement of funds under this award, the recipient certifies that it does not operate programs promoting diversity, equity, and inclusion that violate any applicable federal anti-discrimination laws.

# III.   DOE Terms

## A. Liability

By entering into this agreement, the recipient attests that DOE has no responsibility or liability to the recipient, subrecipient, or third persons (including but not limited to contractors) for settlement of contractual and administrative protests, disputes, and claims arising out of transactions executed in support of the award or for the actions of the recipient, subrecipient, or third persons resulting in death, bodily injury, property damages, or any other losses resulting in any way from the performance of this award.

Please refer to the Federal Assistance Reporting Checklist, Special Status Reports for notification requirements associated with this Term.

## B. Interim Conflict of Interest Policy for Financial Assistance

The DOE interim Conflict of Interest Policy for Financial Assistance (COI Policy) is applicable to all recipients applying for, or that receive, DOE funding by means of a DOE financial assistance award (e.g., a grant, cooperative agreement, technology investment agreement, or other transaction authority) and, through the implementation of this policy by the recipient, to each Investigator who is planning to participate in, or is participating in, the project funded wholly or in part under this award.  The term "Investigator" means the Principal Investigator (PI) and any other person, regardless of title or position, who is responsible for the purpose, design, conduct, or reporting of a project funded by DOE or proposed for funding by DOE.

The recipient must flow down the requirements of the interim COI Policy to any subrecipient, except for DOE National Laboratories.  Further, the recipient must identify all

 **U.S. DEPARTMENT OF ENERGY**    **DOE Standard Terms and Conditions**

financial conflicts of interest (FCOI), i.e., managed and unmanaged/unmanageable, in its initial and ongoing FCOI reports.

Prior to award, the recipient was required to: 1) ensure all Investigators on this award completed their significant financial disclosures; 2) review the disclosures; 3) determine whether a FCOI exists; 4) develop and implement a management plan for FCOIs; and 5) provide DOE with an initial FCOI report that includes all FCOIs (i.e., managed and unmanaged/unmanageable). The recipient must be in full compliance with the other requirements set forth in DOE's interim COI Policy. Further, the recipient must submit updated reports within 30 days of a change.

In accordance with the DOE interim Conflict of Interest Policy for Financial Assistance (COI Policy), prior to the expenditure of funds associated with an unmanaged or unmanageable FCOI, the recipient must submit a FCOI report for prior approval. Costs associated with the unmanaged FCOI are unallowable absent prior approval. For a list of the information that must be included the disclosure, see Section V.  of the DOE interim Conflict of Interest Policy for Financial Assistance.

## C. Organizational Conflict of Interest

The DOE interim Conflict of Interest Policy for Financial Assistance (COI Policy) is applicable to all recipients applying for, or that receive, DOE funding by means of a DOE financial assistance award (e.g., a grant, cooperative agreement, technology investment agreement, or other transaction authority).

Organizational conflicts of interest are those where, because of relationships with a parent company, affiliate, or subsidiary organization, the recipient is unable or appears to be unable to be impartial in conducting procurement action involving a related organization 2 CFR 200.318(c)(2).

The recipient must disclose in writing any potential or actual organizational conflict of interest to the Grants Officer for prior approval. The recipient must provide the disclosure prior to engaging in a procurement or transaction using project funds with a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian tribe. For a list of the information that must be included the disclosure, see Section VI.  of the DOE interim Conflict of Interest Policy for Financial Assistance. Absent prior approval, the procurement or transaction may not be pursued under the award

If the effects of the potential or actual organizational conflict of interest cannot be avoided, neutralized, or mitigated, the recipient must procure goods and services from other sources when using project funds. Otherwise, DOE may terminate the award in accordance with 2 CFR 200.340 unless continued performance is determined to be in the best interest of the federal government.



**DOE Standard Terms and Conditions**

The recipient must flow down the requirements of the interim COI Policy to any subrecipient, except for DOE National Laboratories, if applicable. The recipient is responsible for ensuring subrecipient compliance with this term.

If the recipient has a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian tribe, the recipient must maintain written standards of conduct covering organizational conflicts of interest.

## D. Environmental, Safety and Health Performance of Work at DOE Facilities

If any portion of the work under this award is performed at a DOE-owned or controlled site, the recipient agrees to comply with all State and Federal Environmental, Safety and Health (ES&H) regulations and with all other ES&H requirements of the operator of such site.

Prior to the performance on any work at a DOE-owned or controlled site, the recipient shall contact the site facility manager for information on DOE and site-specific ES&H requirements.

## E. Insolvency, Bankruptcy or Receivership

The recipient shall immediately, but no later than five days, notify the Grants Officer, Specialist, and Federal Program Manager of the occurrence of any of the following events: (1) the recipient or the recipient's parent's filing of a voluntary case seeking liquidation or reorganization under the Bankruptcy Act; (2) the recipient's consent to the institution of an involuntary case under the Bankruptcy Act against the recipient or the recipient's parent; (3) the filing of any similar proceeding for or against the recipient or the recipient's parent, or the recipient's consent to the dissolution, winding-up or readjustment of its debts, appointment of a receiver, conservator, trustee, or other officer with similar powers over the recipient, under any other applicable state or federal law; (4) the recipient's insolvency due to its inability to pay debts generally as they become due, or (5) auditor findings that document doubt about the recipient's ability to continue as a going concern.

Such notification shall be in writing and shall: (1) specifically set out the details of the occurrence of an event; (2) provide the facts surrounding that event; and (3) provide the impact such event will have on the project being funded by this award.

Upon the occurrence of any of the events described in this term, DOE reserves the right to conduct a review to determine the recipient's compliance with the required elements of the award (including such items as cost share, progress towards technical/program project objectives, and submission of required reports). If the DOE review determines that there are significant deficiencies or concerns with the recipient's performance under the award, DOE reserves the right to impose specific conditions set forth in 2 CFR 200.208, as needed, including (1) change of payment method; or (2) institute payment controls.

 **DOE Standard Terms and Conditions**

Failure of the recipient to comply with this term may be considered a material noncompliance of this award by the Grants Officer.

# F. Impacted Indian Tribes

**Applicable to awards made after 4/5/2024 as indicated in block 7 of the Assistance Agreement.**

If any activities anticipated to take place under this agreement could potentially impact the resources or reserved rights of Indian Tribe(s), as defined in 25 U.S.C. § 5304 (e), then the recipient/awardee agrees to develop and maintain active and open communications with the potentially impacted Indian Tribe(s), during the period of performance of the agreement, and, if necessary, after the end of the agreement.  If the recipient proposes any activities that could impact Tribal resources or reserved rights, including but not limited to lands, cultural sites, sacred sites, water rights, mineral rights, fishing rights, and hunting rights, the recipient must notify DOE.  The recipient/awardee must coordinate with DOE on all Tribal interactions.  DOE will determine if formal government-to-government consultation is needed, and DOE will conduct that consultation accordingly.
- Tribal lands are defined in 25 U.S.C. §§ 3501(2), (3), (4)(A) and (13)
- Indian Tribe is as defined in 25 U.S.C. § 5304 (e)

# G. Acknowledgement and Disclaimer Language

The recipient is required to include the following acknowledgement and disclaimer language in information products in any medium or format used to convey results, findings, or technical innovations from research and development or other scientific and technological work that are prepared with the intention of being preserved and disseminated in the broadest sense applicable.

- *Acknowledgment:* "This material is based upon work supported by the U.S.  Department of Energy's [enter program office (e.g.  Hydrocarbons and Geothermal Energy Office)] under the [enter Technology Office (e.g., Geothermal Technology Office (GTO)) and initiative name (e.g., Geothermal Resources' Value in Implementing Decarbonization (GRID)) if applicable] award Number DE-[insert award number]."

- *Full Legal Disclaimer:* "This report was prepared as an account of work sponsored by an agency of the United States Government.  Neither the United States Government nor any agency thereof, nor any of their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights.  Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof.  The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof."

**U.S. DEPARTMENT OF ENERGY**

**DOE Standard Terms and Conditions**

- *Abridged Legal Disclaimer:* "The views expressed herein do not necessarily represent the views of the U.S. Department of Energy or the United States Government."

The recipient should make every effort to include the full Legal Disclaimer. However, if recipients are constrained by formatting and/or page limitations set by the publisher, the abridged Legal Disclaimer is an acceptable alternative.

# IV. Research, Technology, and Economic Security (RTES) Terms

## A. RTES Due Diligence Reviews and Monitoring

All DOE-supported projects are subject to ongoing research, technology and economic security (RTES) due diligence reviews and monitoring to identify potential RTES risks from undue foreign influence; assess compliance with the RTES requirements set forth in the award; and, if applicable, compliance with risk mitigation measures. As part of the RTES due diligence reviews and monitoring, DOE may require the recipient or project team members to provide additional disclosures and information to inform the reviews.

All project participants, which for purposes of this term includes individuals participating in the project, are subject to RTES due diligence reviews. The due diligence review of covered individuals includes but is not limited to the review of resumes/bio-sketches, disclosures, and certifications. DOE reserves the right to require resumes/bio-sketches, disclosures, and certifications for project participants not defined as covered individuals. The recipient is not required to submit any additional information on non-covered individuals, unless requested by DOE. The volume and type of information collected may depend on various factors associated with the award. Note this review is separate and distinct from "DOE Order 142.3B "Unclassified Foreign National Access Program"".

In the event an RTES risk is identified, DOE may require risk mitigation measures, including but not limited to, requiring that an individual or entity not participate in the award. If significant risks are identified and cannot be sufficiently mitigated, DOE may elect to discontinue funding the award.

Consistent with Section 4(e) of the Presidential Memorandum on United States Government-Supported Research and Development National Security Policy-33 (NSPM-33), DOE may share information regarding the risks identified as part of the RTES due diligence review process or monitoring with other Federal agencies.

DOE's decision regarding a due diligence review is not appealable.

 **DOE Standard Terms and Conditions**

# B. Required Risk Mitigation

**Applicable to awards made after 10/1/2024 as indicated in block 7 of the Assistance Agreement.**

In the event the recipient or subrecipient has entered into a mitigation agreement with DOE outside the terms and conditions, the following term applies.

This award is subject to the recipient's compliance with the required DOE Office of Research, Technology, and Economic Security (RTES) mitigation measures that are specific to the recipient, if any.  Failure to comply with required RTES mitigation measures is grounds for an immediate termination of the award.  This term must be flowed down to any and all subrecipients.  If a subrecipient fails to comply with required RTES mitigation measures, if any, that are specific to that subrecipient, it is grounds for immediate termination of the subaward.  If a mitigation measure impacts a contractor, the recipient is responsible for flowing down the mitigation measure to the contractor.

# C. Transparency of Foreign Connections

Prior to DOE making the award, the recipient and subrecipient(s) were required to provide Transparency of Foreign Connections disclosures.  The recipient must notify the Grants Officer within fifteen (15) business days of learning of the circumstances listed below in relation to the recipient and subrecipients.  The updated disclosures are subject to an RTES due diligence review (see RTES Due Diligence Reviews and Monitoring term above).

Disclosure exceptions by entity type:

- U.S.  National Laboratories and domestic government entities are not required to respond to the Transparency of Foreign Connections disclosure.
- Institutions of Higher Education are only required to report on items with an asterisk symbol (*).
- The applicability of disclosure requirements is determined by the entity type.  Regardless of whether the recipient is exempt, the subrecipient(s) must provide these disclosures unless the subrecipient is also exempt.

**Questions:** Contact rtesinfo@hq.doe.gov

**Disclosure Format:** For the convenience of the entity providing the disclosure and certification, a template is available at Transparency of Foreign Connections | Department of Energy; however, the entity is not required to use this specific format.  If another format is used, the signatory must include the same substantive information, a signature, date, and the certification statement provided below.

Disclosure Information:
1. *Any principal investigator, project manager, or other covered individual, or business owner, officer that is party to a Malign Foreign Talent Recruitment Program (MFTRP);



**DOE Standard Terms and Conditions**

2. Any current or pending change in ownership structure of the recipient or subrecipients that increases foreign ownership related to a foreign country of concern;

3. Any new or pending parent company, joint venture, or subsidiary, of your entity that is based in or receives funding from any foreign country of concern;

4. Any new or pending contractual or financial obligation or other agreement specific to a business arrangement, or joint venture-like arrangement with an entity based in, or funded by, any foreign country of concern;

5. Any new or pending venture capital or institutional investment by an entity that has a general partner or other individual holding a leadership role who has a foreign affiliation with any foreign country of concern;

6. *Any new or pending technology licensing or intellectual property sales or transfers to a foreign country of concern where the underlying technology is in the same technology area (e.g., biotechnology, energy generation and storage, advanced computing) as the project;

7. Any new or pending foreign business entity, offshore entity, or entity outside the United States that is based in, or funded by, any foreign country of concern;

8. Any changes to the recipient or the subrecipients' board of directors, including additions to the number of directors and the identity of new directors.  Each notification shall include a complete up-to-date list of all directors (and board observers), including their full name, shareholder affiliation, date of appointment, voting rights, citizenship, duration of term, as well as a description of observer rights as applicable;

9. Any new or pending indebtedness, liabilities, or obligations to an entity based in, or funded by, any foreign country of concern (whether the recipient or subrecipient is borrower, surety, guarantor, or other); and,

10. *Any of the following changes to the equipment proposed for use on the project:

    i. Federal Acquisition Security Council (FASC)-prohibited unmanned aircraft systems or the operation thereof.
    ii. Coded equipment where the source code is written in a foreign country of concern.
    iii. Equipment from a foreign country of concern that will be connected to the internet or other remote communication system.
    iv. Any entity from a foreign country of concern that will have physical or remote access to any part of the equipment used on the project after delivery.

11. * If the project is supporting the deployment of battery energy storage systems (BESS), disclose any changes to BESS vendors, integrators, suppliers, and/or manufacturers (see TFC template for further details).

Certifications:

Individuals participating in a Malign Foreign Talent Recruitment Program are prohibited from participating in a DOE award.  The recipient and the subrecipients must certify that 1) the covered individuals in their respective employment have been made aware of the Malign Foreign Talent Recruitment Program prohibition and 2) the individuals have complied with their responsibilities to certify they are not party to a Malign Foreign Talent Recruitment Program.

> I am providing this disclosure and certification on behalf of the above-mentioned entity as part of my responsibilities as the entity's authorized official for the above-mentioned



**U.S. DEPARTMENT OF ENERGY**

**DOE Standard Terms and Conditions**

project. I certify to the best of my knowledge and belief that the information contained in this document is true, complete, and accurate.

I further certify that 1) the covered individuals in their respective employment have been made aware of the Malign Foreign Talent Recruitment Program prohibition and 2) the covered individuals have complied with their responsibilities to certify they are not party to a Malign Foreign Talent Recruitment Program.

I understand any false fictitious, or fraudulent information, misrepresentations, half-truths, or omissions of material fact, may subject me to criminal, civil, or administrative penalties for fraud, false statements, false claims or otherwise. (18 U.S.C. §§ 1001 and 287, and 31 U.S.C. §§ 3729, 3733, and 3801-3812). I further understand and agree that (1) the statements and representations made in this document are material to DOE's funding decision; (2) in the event DOE issues an award, should I later learn during the life of the award that an individual participating in the project funded under the award is or is reasonably believed to be involved with a Malign Foreign Talent Recruitment Program, I must notify the cognizant Grants Officer within five business days on learning such information; and (3) I have an ongoing responsibility to update the disclosures provided above during the period of performance of the award if there is (i) there is any change to a disclosure, (ii) there is any material misstatement that DOE could determine poses a risk to economic or national security, or (iii) there is a change in ownership, change to entity structure, or other substantial change in the circumstances of the entity that DOE could determine poses a risk.

| Authorized Official: | Title: |
|---|---|
| Signature: | Date: |

Should DOE determine the connection poses a risk to economic or national security, DOE will require measures to mitigate or eliminate the risk.

The term "foreign country of concern" means the People's Republic of China, the Democratic People's Republic of Korea, the Russian Federation, the Islamic Republic of Iran, or any other country determined to be a country of concern by the Secretary of State per sec. 10638(2) of P.L. 117-167, and including countries of risk designated by the Department of Energy.

Recognizing the disclosures may contain business confidential information, subrecipients may submit their disclosures directly to DOE.

Changes to subrecipients from those in the originally approved award require prior approval from the Grants Officer. Before adding new subrecipients and contractors to the project, the recipient must submit a written request to the Grants Officer. For proposed changes



**DOE Standard Terms and Conditions**

to subrecipients, the recipient must provide a Transparency of Foreign Connections disclosure for each new subrecipient.

# D. Foreign Collaboration Considerations

## 1. New Collaborations

The recipient must provide DOE with advanced written notification of any potential collaboration with foreign entities, organizations, or governments in connection with its DOE-funded award scope. The recipient must await further guidance from DOE prior to contacting the proposed foreign entity, organization or government regarding the potential collaboration or negotiating the terms of any potential agreement.

## 2. Existing Collaborations

The recipient must provide DOE with a written list of all existing foreign collaborations, organizations, and governments in which it has entered in connection with its DOE-funded award scope.

## 3. Definition of Collaboration

In general, a collaboration will involve contributing a tangible or intangible resource of value or benefit to, or from, the recipient. This value or benefit includes but may not be limited to all resources made available to, or from, the recipient in support of and/or related to the award, regardless of whether or not they have monetary value. Things of value also may include in-kind contributions (such as office/laboratory space, data, equipment, supplies, employees, students). In-kind contributions not intended for direct use on the award, but which result in the provision of value to or from the award must also be reported. Collaborations do not include routine workshops, conferences, use of the recipient's services and facilities by foreign investigators resulting from its standard published process for evaluating requests for access, or the routine use of foreign facilities by awardee staff in accordance with the recipient's standard policies and procedures.

# E. Research Security Training Requirement

**Applicable to awards made after 10/1/2024 as indicated in block 7 of the Assistance Agreement.**

Effective May 1, 2025, the Research Security Training Requirement is mandatory for research and development awards. (See Policy Flash 2025-04.) Recipients must maintain a research security training program for covered individuals on the project, consistent with the requirements in Section 10634 of the CHIPS and Science Act of 2022. Any new covered individuals at the recipient and subrecipient levels added to the project must certify that they have completed the training within thirty (30) calendar days of the individual joining the project (see Current and Pending Support in the Special Terms and Conditions for the definition of covered individual and for certification instructions).

In addition, the recipient must maintain sufficient records (records must be retained for the time period noted in 2 CFR 200.334 and made available to DOE upon request) of its



**DOE Standard Terms and Conditions**

compliance with this requirement for covered individuals at the recipient organization and it must extend this requirement to any and all subrecipients.

## F. Digital Persistent Identifiers

Throughout the lifetime of the award, those individuals conducting research and development (R&D) under the award at the prime and subaward level must obtain and use a digital persistent identifier (PID) for themselves that meets the common/core standards specified in the NSPM-33 Implementation Guidance or successor guidance (e.g., an ORCID iD).  DOE requires recipients of federal awards with R&D activities, or technical assistance that supports R&D activities, to use the PID when publishing R&D outputs when that is an available option.  Individuals conducting R&D activities at the prime and subaward level must report their R&D outputs as outlined in the award "Federal Assistance Reporting Checklist" (FARC).  The PID for individuals must be provided when reporting R&D outputs to the Department of Energy Office of Scientific and Technical Information (DOE OSTI).

Covered individuals must also include their PIDs in the current and pending support disclosures.

## G. Entity of Concern Prohibition

**Applicable to awards made after 10/1/2024 as indicated in block 7 of the Assistance Agreement.**

No Entity of Concern as defined in Section 10114 of Public Law 117-167 (42 USC 18912), may receive any grant, contract, cooperative agreement, or loan of $10 million or more in Department of Energy funds including funds made available by the Consolidated Appropriations Act, 2024 (Public Law 118-42).

In addition, for all awards involving Departmental activities authorized under Public Law 117-167, no Entity of Concern (including an individual that owns or controls, is owned or controlled by, or is under common ownership or control with an Entity of Concern) may receive DOE funds or perform work under the award, subject to certain penalties.  See Section 10114 of Public Law 117-167 (42 USC 18912) and Division D, Title III, Section 310 of Division D of the Consolidated Appropriations Act of 2024 (Pub.  L.  No.  118-42) for additional information.

The recipient shall include this Term, suitably modified to identify the parties, in all subawards/contracts, regardless of tier, under this award.

The recipient must exercise ongoing due diligence to reasonably ensure that no such Entity of Concern is participating on the award.  If, at any time, the recipient becomes aware that any participant on the award is an Entity of Concern and therefore is unable to fully comply with this term, the recipient shall promptly stop all work on this award, notify the Grants Officer within five (5) business days, and not proceed with the award work without further authorization.

 **U.S. DEPARTMENT OF ENERGY**

**DOE Standard Terms and Conditions**

# H. Performance of Work in United States (Foreign Work Waiver)

## 1. Requirement

All work performed under this award must be performed in the United States, absent a written waiver approved by DOE and prior approval by the Grants Officer.  See Prior Approval Term in the Special Terms and Conditions.

## 2. Failure to Comply

If the recipient fails to comply with the Performance of Work in the United States requirement, DOE may deny reimbursement for the work conducted outside the United States and such costs may not be recognized as allowable recipient cost share.  The recipient is responsible should any work under this award be performed outside the United States, absent a waiver, regardless of whether the work is performed by the recipient, subrecipients, contractors or other project partners.

## 3. Waiver

To seek a waiver, the recipient must submit a written waiver request to DOE.  The requirements for submission of the waiver are included within the NOFO under which the project was selected.  DOE may require additional information in considering a waiver request.

The prior approval request must include submission of a request to waive the Performance of Work in the United States requirement.  A waiver request must satisfactorily demonstrate that a waiver would further the purposes of the NOFO/program that the award was selected under, is otherwise in the best interest of the DOE programmatic objectives, is in the economic and energy security interests of the United States, does not pose an undue RTES risk (see RTES Due Diligence term above) and is otherwise in the best interest of DOE program goals and agency priorities.

DOE's decision regarding a waiver request is not appealable.

# I. Export Control

The United States government regulates the transfer of information, commodities, technology, and software considered to be strategically important to the United States to protect national security, foreign policy, and economic interests without imposing undue regulatory burdens on legitimate international trade.  There is a network of federal agencies and regulations that govern exports that are collectively referred to as "Export Controls." All recipients and subrecipients are responsible for ensuring compliance with all applicable United States Export Control laws and regulations relating to any work performed under a resulting award.

The recipient must immediately report to DOE any export control notifications to Department of Commerce, investigations, indictments, charges, convictions, and violations upon occurrence, at the recipient or subrecipient level, and provide the corrective action(s) to prevent future violations.


**U.S. DEPARTMENT OF ENERGY**                    **DOE Standard Terms and Conditions**

## J. Malign Foreign Talent Recruitment Program Prohibition

### 1. Prohibition

Individuals participating in a Malign Foreign Talent Recruitment Program are prohibited from participating in this award.

The recipient must exercise ongoing due diligence to reasonably ensure that no individuals participating on the DOE-funded project are participating in a Malign Foreign Talent Recruitment Program. Consequences for violations of this prohibition will be determined according to applicable law, regulations, and policy. Further, the recipient must notify DOE within five (5) business days upon learning that an owner of the recipient or subrecipient or individual on the project team is or is believed to be participating in a Malign Foreign Talent Recruitment Program. DOE may modify and add requirements related to this prohibition to the extent required by law.

### 2. Required Certifications

a. *Each covered individual* must certify on an annual basis that they are not party to a Malign Foreign Talent Recruitment Program.
b. The recipient and the subrecipients must certify that the covered individuals in their respective employment have been made aware of the Malign Foreign Talent Recruitment Program prohibition and have complied with their certification responsibilities identified in 2.a.

### 3. Non-Discrimination

DOE will ensure that the Malign Foreign Talent Recruitment Program Prohibition is carried out in a manner that does not target, stigmatize, or discriminate against individuals on the basis of race, ethnicity, or national origin, consistent with Sections 10637 of P.L. 117-167 (42 USC 19236).

# V.   Financial Terms
## A. Pre-Award Costs

In accordance with 2 CFR 200.210 and 2 CFR 200.458, pre-award costs are those incurred after the project selection date and prior to the effective date of the award pursuant to negotiation and in anticipation of the federal award where such costs are necessary for efficient and timely performance of the scope of work. These costs are allowable only to the extent that they would have been allowed if incurred after the start date of the federal award and only with the prior approval of the Grants Officer. See Prior Approval Term in the Special Terms and Conditions.

Although the Grants Officer may provide prior approval for the recipient to incur pre-award costs, pre-award expenditures are made at the selectee's risk. DOE is not obligated to reimburse costs: (1) in the absence of appropriations; (2) if an award is not made; (3) if an award is made for a lesser amount than the selectee anticipated; or (4) if specific conditions set forth in 2 CFR 200.208 apply.



**DOE Standard Terms and Conditions**

Pre-award costs and scope must be included within the first budget period of the award (if the award has multiple budget periods), be clearly identified in award documents and must be included in the budget justification workbook and the award SF-424A.

DOE National Laboratories are not authorized to incur or be reimbursed for pre-award costs.

## B. Cost Share Compliance

If cost sharing is required, the cost sharing requirements set forth in 2 CFR 200.306 and 2 CFR 910.130 apply.  The recipient must meet cost sharing commitments, if any, identified in the Special Terms and Conditions.

The cost share percentage is calculated by dividing the recipient's cost share by the total allowable project costs for the award where the total allowable project costs include government share (including Federally Funded Research and Development Center (FFRDC) costs, when applicable) and cost share (see 2 CFR 910.130).  If FFRDCs are applicable and the DOE (FFRDC) effort is funded directly by DOE, the FFRDC costs are not included in the total approved budget attachment for this award.  In this scenario, the recipient will not be responsible for reporting on the FFRDC portion of the total estimated cost, but the cost must be included in all cost sharing calculations since the effort is included within the overall project scope.

If the recipient determines that it is unable to meet its cost sharing obligations, the recipient must notify the Grants Officer in writing immediately.  The notification must include the following information: (1) whether the recipient intends to continue or phase out the project, and (2) if the recipient intends to continue the project, (3) how the recipient will pay (or secure replacement funding for) the recipient's share of the total project cost.

If the award is terminated or is otherwise not funded to completion, the recipient must provide the greater of: (1) the cumulative cost share percentage required in the Special Terms and Conditions or (2) the minimum cost share percentage required in the Notice of Funding Opportunity under which the recipient was selected when applied to the total project cost reimbursed as of the date of the termination or discontinuation.  The recipient must comply with requirements set forth in 2 CFR 200.343, 2 CFR 200.344, 2 CFR 200.345, and 2 CFR 200.346.

The recipient must immediately notify DOE of cost share requirement violations or the inability of the recipient to meet its cost sharing obligations.

## C. Federal Payment

The recipient will receive payments in accordance with payment requirements in the award Special Terms and Conditions.

All payments will be made by electronic funds transfer to the bank account identified on the Bank Information Form that the recipient files with the U.S.  Department of Treasury.



**DOE Standard Terms and Conditions**

The recipient must disburse any funds that are available from repayments to, and interest earned on a revolving fund, program income, rebates, refunds, contract settlements, audit recoveries, credits, discounts, and interest earned on any of those funds before requesting additional cash payments.

If the award includes multiple budget periods, the recipient may not spend more than the federal share authorized for that particular budget period, without specific written approval from the Grants Officer. The recipient must immediately refund DOE any amount reimbursed or drawn down more than the authorized amount for a budget period. The recipient and subrecipients shall promptly, but at least quarterly, remit to DOE interest earned on advances drawn in excess of disbursement needs and shall comply with the procedure for remitting interest earned to the federal government per 2 CFR 200.305, as applicable.

The DOE payment authorizing official may request additional information from the recipient to support the payment requests prior to release of funds, as deemed necessary. The recipient is required to comply with these requests. Supporting documents include invoices, copies of contracts, contractor quotes, and other expenditure explanations that justify the reimbursement requests.

The recipient must immediately notify DOE of any improper claims or excess payments arising out of or relating to work under the award immediately upon occurrence.

# D. Audits

## 1. Government-Initiated Audits

The recipient must provide any information, documents, site access, or other assistance requested by DOE or federal auditing agencies (e.g., DOE Inspector General, Government Accountability Office) for the purpose of audits and investigations. Such assistance may include, but is not limited to, reasonable access to the recipient's records relating to this award.

Consistent with 2 CFR 200.503 as adopted and supplemented by 2 CFR 910.503, DOE may audit or review the recipient's financial records or administrative records relating to this award at any time. Audits or reviews may be performed to determine if the recipient has an adequate financial management system to estimate, bill, and record federal government expenditures in accordance with the criteria in 2 CFR 200.302, Generally Accepted Accounting Principles (GAAP), Generally Accepted Government Accounting Standards (GAGAS), and Standard Form 1408. Government-initiated audits are generally paid for by DOE.

DOE may conduct a final audit at the end of the period of performance (or the termination of the award, if applicable). Upon completion of the audit, the recipient is required to refund to DOE any payments for costs that were determined to be unallowable. If the audit has not been performed or completed prior to the closeout of the award, DOE retains the right to recover an appropriate amount after fully considering the recommendations on disallowed costs resulting from the final audit.



**DOE Standard Terms and Conditions**

DOE will provide reasonable advance notice of audits and will minimize interference with ongoing work, to the maximum extent practicable.

### 2. Annual Independent Audits (Single Audit or Compliance Audit)

The non-profit recipient must comply with the annual independent audit requirements in 2 CFR 200.500 through 2 CFR 2 CFR 200.521 (Single Audit) and a for-profit recipient must comply with the audit requirements set forth in 2 CFR 910.500 through 2 CFR 910.521 (Compliance Audit).

The annual independent audits are separate from Government-initiated audits discussed in this Term and must be paid for by the recipient.  To minimize expense, the recipient may have a Compliance audit in conjunction with its annual audit of financial statements.  The financial statement audit is **not** a substitute for the Compliance audit.  If the audit (Single audit or Compliance audit, depending on recipient entity type) has not been performed or completed prior to the closeout of the award, DOE may impose one or more of the actions outlined in 2 CFR 200.339, Remedies for Noncompliance.

## E. Conference Spending

In accordance with Section 739 of Division E of the Consolidated and Further Continuing Appropriations Act of 2015 (Pub. L. No. 113-235), the recipient shall not expend any funds on a conference not directly and programmatically related to the purpose for which the grant or cooperative agreement was awarded that would defray the cost to the United States Government of a conference held by any Executive branch department, agency, board, commission, or office for which the cost to the United States Government would otherwise exceed $20,000, thereby circumventing the required notification by the head of any such Executive Branch department, agency, board, commission, or office to the Inspector General (or senior ethics official for any entity without an Inspector General), of the date, location, and number of employees attending such conference.

## F. Budget Changes

**State Energy Program awards should refer to the Budget Changes Term in the Special Terms and Conditions of their award.**

### 1. Budget Changes Generally

The Grants Officer has reviewed and approved the SF-424A attached to this award.

Any increase in the total project cost, whether DOE share or Cost Share, which is stated as "Total" in Block 12 to the Assistance Agreement of this award, must be approved in advance and in writing by the Grants Officer.

Any change that alters the project scope, milestones or deliverables requires prior written approval of the Grants Officer.  DOE may deny reimbursement for any failure to comply with the requirements in this term.



**DOE Standard Terms and Conditions**

## 2. Transfers of Funds Among Direct Cost Categories

The recipient is required to obtain the prior written approval of the Grants Officer for any transfer of funds among direct cost categories where the cumulative amount of such transfers exceeds or is expected to exceed 10 percent of the total project cost, which is stated as "Total" in Block 12 to the Assistance Agreement of this award.[1]

# G. Subrecipient Change Notification

Except for subrecipients specifically proposed as part of the recipient's Application for award, the recipient must notify the Grants Officer and Federal Project Manager in writing 30 days prior to the execution of new or modified subrecipient agreements, including naming any "To Be Determined" subrecipients. This notification does not constitute a waiver of the prior approval requirements outlined in 2 CFR Part 200 as adopted and supplemented by 2 CFR Part 910, nor does it relieve the recipient from its obligation to comply with applicable federal statutes, regulations, and Executive Orders.

To satisfy this notification requirement, the recipient documentation must, at a minimum, include the following:

1. A description of the research to be performed, the service to be provided, or the equipment to be purchased;
2. Cost share commitment letter if the subrecipient is providing cost share to the award;
3. An assurance that the process undertaken by the recipient to solicit the subrecipient complies with their written procurement procedures as outlined in 2 CFR 200.317 through 200.327;
4. An assurance that no planned, actual or apparent conflict of interest exists between the recipient and the selected subrecipient and that the recipient's written standards of conduct were followed;[2]
5. A completed Environmental Questionnaire, if applicable;

---

[1] For example, if personnel costs increased by 8% of total project costs, prior written approval from the Grants Officer is not required. However, if there is an additional change to increase supplies by 3%, the total project cost change is 11% and prior written approval from the Grants Officer is required.

[2] It is DOE's position that the existence of a "covered relationship" as defined in 5 CFR 2635.502(a)&(b) between a member of the recipient's owners or senior management and a member of a subrecipient's owners or senior management creates at a minimum an apparent conflict of interest that would require the recipient to notify the Grants Officer and provide detailed information and justification (including, for example, mitigation measures) as to why the subrecipient agreement does not create an actual conflict of interest. The recipient must also notify the Grants Officer of any new subrecipient agreement with: (1) an entity that is owned or otherwise controlled by the recipient; or (2) an entity that is owned or otherwise controlled by another entity that also owns or otherwise controls the recipient, as it is DOE's position that these situations also create at a minimum an apparent conflict of interest.



**DOE Standard Terms and Conditions**

6. A completed Transparency of Foreign Connections disclosure, if applicable, which includes the information as required in the NOFO that the award was selected under;
7. An assurance that the subrecipient is not a debarred or suspended entity; and
8. An assurance that all required award provisions will be flowed down in the resulting subrecipient agreement.

The recipient is responsible for making a final determination to award or modify subrecipient agreements under this agreement, but the recipient may not proceed with the subrecipient agreement until the Grants Officer determines, and provides the recipient written notification, that the information provided is adequate.

Should the recipient not receive a written notification of adequacy from the Grants Officer within 30 days of the submission of the subrecipient documentation stipulated above, the recipient may proceed to award or modify the proposed subrecipient agreement.

# VI.   Equipment and Real Property Terms
## A. Notice Regarding the Purchase of American-Made Equipment and Products – Sense of Congress

It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available under this award should be American-made.

## B. Title to Real Property and Equipment

Pursuant to Section 309 of Division D of the Consolidated Appropriations Act of 2023 (Pub. L. No. 117-328) for energy development, demonstration, and deployment programs awarded in fiscal year 2022 or later, DOE may, at its discretion, vest unconditional title or other property interests acquired under projects in the recipient, a subrecipient, or successor in interest, including the United States, at the conclusion of the award period.

## C. Federally Owned Property (Government-Furnished)

If the recipient requires federally owned equipment to achieve project objectives, the recipient must submit a prior approval request to the Grants Officer.

The request must identify the equipment required and the tasks that the equipment will fulfill within the project scope. The request must also demonstrate that use of the equipment is in the DOE's best interest; that the overall benefit to the project outweighs the increased costs of administration; that providing the property does not increase the DOE's assumption of risk; and that DOE requirements cannot otherwise be met. The recipient's inability or unwillingness to supply its own resources is not sufficient reason for the DOE to furnish or acquire property to support the project.



**DOE Standard Terms and Conditions**

If approved, federally owned property must be managed in accordance with 2 CFR 200.312 and reported as prescribed in the Federal Assistance Reporting Checklist and Instructions.

Absent authorization from the Grants Officer, federally owned property will not be provided to support the project objectives.

# EXHIBIT 2



**Office of the Attorney General**
**Washington, D. C. 20530**

July 29, 2025

MEMORANDUM FOR ALL FEDERAL AGENCIES

FROM:            THE ATTORNEY GENERAL

SUBJECT:         GUIDANCE FOR RECIPIENTS OF FEDERAL FUNDING
                 REGARDING UNLAWFUL DISCRIMINATION

## I.   INTRODUCTION

One of our Nation's bedrock principles is that all Americans must be treated equally. Not only is discrimination based on protected characteristics illegal under federal law, but it is also dangerous, demeaning, and immoral. Yet in recent years, the federal government has turned a blind eye toward, or even encouraged, various discriminatory practices, seemingly because of their purportedly benign labels, objectives, or intentions. No longer. Going forward, the federal government will not stand by while recipients of federal funds engage in discrimination.

This guidance clarifies the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion ("DEI") programs.[1] Entities receiving federal funds, like all other entities subject to federal antidiscrimination laws, must ensure that their programs and activities comply with federal law and do not discriminate on the basis of race, color, national origin, sex, religion, or other protected characteristics—no matter the program's labels, objectives, or intentions. In furtherance of that requirement, this guidance identifies "Best Practices" as non-binding suggestions to help entities comply with federal antidiscrimination laws and avoid legal pitfalls; these are not mandatory requirements but rather practical recommendations to minimize the risk of violations.

Entities that receive federal financial assistance or that are otherwise subject to federal anti-discrimination laws, including educational institutions, state and local governments, and public and private employers, should review this guidance carefully to ensure all programs comply with their legal obligations.

---

[1] DEI programs go by other names as well, such as Diversity, Equity, Inclusion, and Accessibility ("DEIA") and Diversity, Equity, Inclusion, and Belonging ("DEIB").

## II.    EXECUTIVE SUMMARY

This guidance emphasizes the significant legal risks of initiatives that involve discrimination based on protected characteristics and provides non-binding best practices to help entities avoid the risk of violations. Key points include:

- **Statutory nondiscrimination requirements:** Federal law prohibits discrimination based on protected characteristics like race, sex, color, national origin, or religion.

- **Legal pitfalls of DEI Programs:** The use of terms such as "DEI," "Equity," or other euphemistic terms does not excuse unlawful discrimination or absolve parties from scrutiny regarding potential violations.

- **Prohibition on Protected Characteristics as Criteria:** Using race, sex, or other protected characteristics for employment, program participation, resource allocation, or other similar activities, opportunities, or benefits, is unlawful, except in rare cases where such discrimination satisfies the relevant level of judicial scrutiny.

- **Importance of Sex-Separated Intimate Spaces and Athletic Competitions:** Compelling employees to share intimate spaces with the opposite sex or allowing men to compete in women's athletic competitions would typically be unlawful.

- **Unlawful Proxy Discrimination:** Facially neutral criteria (e.g., "cultural competence," "lived experience," geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics.

- **Scrutiny of Third-Party Funding:** Recipients of federal funds should ensure federal funds do not support third-party programs that discriminate.

- **Protection Against Retaliation:** Individuals who object to or refuse to participate in discriminatory programs, trainings, or policies are protected from adverse actions like termination or exclusion based on that individual's opposition to those practices.[2]

## III.    KEY FEDERAL ANTIDISCRIMINATION PROVISIONS AND LAW

Federal antidiscrimination laws prohibit discrimination on the basis of protected characteristics, including race, color, religion, sex, and national origin. The U.S. Supreme Court has consistently held that policies or practices based upon protected characteristics are subject to

---

[2] Unlawful retaliation occurs when a federally funded entity takes adverse actions against employees, participants, or beneficiaries because they engage in protected activities related to opposing DEI practices they reasonably believe violate federal antidiscrimination laws.

Memorandum for All Federal Agencies
Subject:  Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination

Page 3

rigorous judicial scrutiny. Race-based classifications are subject to strict scrutiny, requiring a compelling governmental interest and narrowly tailored means to achieve that interest.[3] Sex-based classifications are subject to heightened scrutiny, requiring an exceedingly persuasive justification and substantial relation to an important governmental objective.[4] Discrimination based on other protected characteristics, such as religion, is also evaluated under analogous standards.[5] Entities receiving federal funds must comply with applicable civil rights laws, including:

- **Title VI of the Civil Rights Act of 1964:** Prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance. This includes most educational institutions, healthcare providers, and state and local government agencies.

- **Title VII of the Civil Rights Act of 1964:** Prohibits employment discrimination based on, or motivated by, race, color, religion, sex, or national origin, in any terms, conditions, or privileges of employment, including hiring, promotion, demotion, termination, compensation, job transfers, training, or access to employment privileges and benefits.

- **Title IX of the Education Amendments of 1972:** Prohibits discrimination based on sex in education programs or activities receiving federal financial assistance. Title IX protections extend beyond athletics and include addressing sexual harassment, sex-based harassment, admissions policies, and equal access to resources and programs.

---

[3] *See, e.g., Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 214 (2023) (holding racial classifications by public institutions are subject to strict scrutiny and racial classifications by private institutions can serve as basis for revoking funding under Title VI); *Ricci v. DeStefano*, 557 U.S. 557, 579 (2009) ("[E]xpress, race-based decision-making violates Title VII's command that employers cannot take adverse employment actions because of an individual's race."); *see also Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (holding grant program with race and sex preferences is unlawful under Equal Protection Clause).

[4] *See, e.g., United States v. Virginia*, 518 U.S. 515, 531 (1996).

[5] *See, e.g., Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 479 (2020) ("The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, protects religious observers against unequal treatment and against laws that impose special disabilities on the basis of religious status . . . . [S]trict scrutiny applies . . . because Montana's no-aid provision discriminates based on religious status"); *Shapiro v. Thompson*, 394 U.S. 618, 631 (1969) (holding discriminating against individual for exercising fundamental constitutional rights is subject to heightened scrutiny), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (relying on Equal Protection principles in holding intentional discrimination against exercise of religion is subject to strict scrutiny).

- **Equal Protection Clause of the Fourteenth Amendment:** Prohibits States from denying any person the equal protection of the laws, relevant in the context of discrimination claims involving state or local government actions.

## IV.    UNLAWFUL DISCRIMINATORY POLICIES AND PRACTICES

The following is a non-exhaustive list of unlawful practices that could result in revocation of grant funding. Federal funding recipients may also be liable for discrimination if they knowingly fund the unlawful practices of contractors, grantees, and other third parties.

### A.    Granting Preferential Treatment Based on Protected Characteristics

#### 1.    What Constitutes Unlawful Preferential Treatment?

Preferential treatment occurs when a federally funded entity provides opportunities, benefits, or advantages to individuals or groups based on protected characteristics in a way that disadvantages other qualified persons, including such practices portrayed as "preferential" to certain groups. Such practices violate federal law unless they meet very narrow exceptions.

#### 2.    Examples of Unlawful Practices

**Race-Based Scholarships or Programs:** A university's DEI program establishes a scholarship fund exclusively for students of a specific racial group (e.g., "Black Student Excellence Scholarship") and excludes otherwise qualified applicants of other races, even if they meet academic or financial need criteria. This extends to any race-exclusive opportunities, such as internships, mentorship programs, or leadership initiatives that reserve spots for specific racial groups, regardless of intent to promote diversity. Such race-exclusive programs violate federal civil rights law by discriminating against individuals based solely on their race or treating people differently based on a protected characteristic without meeting the strict legal standards required for race-conscious programs.

**Preferential Hiring or Promotion Practices:** A federally funded entity's DEI policy prioritizes candidates from "underrepresented groups" for admission, hiring, or promotion, bypassing qualified candidates who do not belong to those groups, where the preferred "underrepresented groups" are determined on the basis of a protected characteristic like race.

**Access to Facilities or Resources Based on Race or Ethnicity:** A university's DEI initiative designates a "safe space" or lounge exclusively for students of a specific racial or ethnic group.

### B.    Prohibited Use of Proxies for Protected Characteristics

#### 1.    What Constitutes Unlawful Proxies?

Unlawful proxies occur when a federally funded entity intentionally uses ostensibly neutral criteria that function as substitutes for explicit consideration of race, sex, or other protected characteristics. While these criteria may appear facially neutral, they become legally problematic under any of the following circumstances:

- They are selected because they correlate with, replicate, or are used as substitutes for protected characteristics.

- They are implemented with the intent to advantage or disadvantage individuals based on protected characteristics.

#### 2.    Examples of Potentially Unlawful Proxies

**"Cultural Competence" Requirements:** A federally funded university requires job applicants to demonstrate "cultural competence," "lived experience," or "cross-cultural skills" in ways that effectively evaluate candidates' racial or ethnic backgrounds rather than objective qualifications. This includes selection criteria that advantage candidates who have experiences the employer associates with certain racial groups. For instance, requiring faculty candidates to describe how their "cultural background informs their teaching" may function as a proxy if used to evaluate candidates based on race or ethnicity.

**Geographic or Institutional Targeting:** A federally funded organization implements recruitment strategies targeting specific geographic areas, institutions, or organizations chosen primarily because of their racial or ethnic composition rather than other legitimate factors.

**"Overcoming Obstacles" Narratives or "Diversity Statements":** A federally funded program requires applicants to describe "obstacles they have overcome" or submit a "diversity statement" in a manner that advantages those who discuss experiences intrinsically tied to protected characteristics, using the narrative as a proxy for advantaging that protected characteristic in providing benefits.

### C.    Segregation Based on Protected Characteristics

#### 1.    What Constitutes Unlawful Segregation?

Segregation based on protected characteristics occurs when a federally funded entity organizes programs, activities, or resources—such as training sessions—in a way that separates or restricts access based on race, sex, or other protected characteristics. Such practices generally violate federal law by creating unequal treatment or reinforcing stereotypes, regardless of the stated goal (e.g., promoting inclusion or addressing historical inequities). Exceptions are narrow

and include only cases where federal law expressly permits race-based remedies for specific, documented acts of past discrimination by the institution itself, or in specialized contexts such as correctional facilities where courts have recognized compelling institutional interests.

While compelled segregation is generally impermissible, failing to maintain sex-separated athletic competitions and intimate spaces can also violate federal law. Federally funded institutions that allow males, including those self-identifying as "women," to access single-sex spaces designed for females—such as bathrooms, showers, locker rooms, or dormitories—undermine the privacy, safety, and equal opportunity of women and girls. Likewise, permitting males to compete in women's athletic events almost invariably denies women equal opportunity by eroding competitive fairness. These policies risk creating a hostile environment under Title VII, particularly where they compromise women's privacy, safety, or professional standing, and can violate Title IX by denying women access to the full scope of sex-based protections in education. To ensure compliance with federal law and to safeguard the rights of women and girls, organizations should affirm sex-based boundaries rooted in biological differences.

## 2.      Examples of Unlawful Practices

**Race-Based Training Sessions:** A federally funded university hosts a DEI training program that requires participants to separate into race-based groups (e.g., "Black Faculty Caucus" or "White Ally Group") for discussions, prohibiting individuals of other races from participating in specific sessions. In contrast, a "Faculty Academic Support Network" open to all faculty interested in promoting student success avoids reliance on protected characteristics and complies with federal law.

**Segregation in Facilities or Resources:** A college receiving federal funds designates a "BIPOC-only study lounge," facially discouraging access by students of other races. Even if access is technically open to all, the identity-based focus creates a perception of segregation and may foster a hostile environment. This extends to any resource allocation—such as study spaces, computer labs, or event venues—that segregates access based on protected characteristics, even if intended to create "safe spaces." This does not apply to facilities that are single-sex based on biological sex to protect privacy or safety, such as restrooms, showers, locker rooms, or lodging.

**Implicit Segregation Through Program Eligibility:** A federally funded community organization hosts a DEI-focused workshop series that requires participants to identify with a specific racial or ethnic group (e.g., "for underrepresented minorities only") or mandates sex-specific eligibility, effectively excluding others who meet objective program criteria. Use of Protected Characteristics in Candidate Selection

## 3.      What Constitutes Unlawful Use of Protected Characteristics?

Unlawful use of protected characteristics occurs when a federally funded entity or program considers race, sex, or any other protected trait as a basis for selecting candidates for employment

(e.g., hiring, promotions), contracts (e.g., vendor agreements), or program participation (e.g., internships, admissions, scholarships, training). This includes policies that explicitly mandate representation of specific groups in candidate pools or implicitly prioritize protected characteristics through selection criteria, such as "diverse slate" requirements, diversity decision-making panels, or diversity-focused evaluations. It also includes requirements that contracting entities utilize a specific level of working hours from individuals of certain protected characteristics to complete the contract. Such practices violate federal law by creating unequal treatment or disadvantaging otherwise qualified candidates, regardless of any intent to advance diversity goals.

### 4. Examples of Unlawful Practices

**Race-Based "Diverse Slate" Policies in Hiring:** A federally funded research institute adopts a policy requiring that all interview slates for faculty positions include a minimum number of candidates from specific racial groups (e.g., at least two "underrepresented minority" candidates), rejecting otherwise qualified candidates who do not meet this racial criterion. This extends to any policy that sets racial benchmarks or mandates demographic representation in candidate pools, such as requiring a certain percentage of finalists to be from "diverse" backgrounds.

**Sex-Based Selection for Contracts:** A federally funded state agency implements a DEI policy that prioritizes awarding contracts to women-owned businesses, automatically advancing female vendors or minority-owned businesses over equally or more qualified businesses without preferred group status. This includes any contract selection process that uses sex or race as a tiebreaker or primary criterion, such as policies favoring "minority- or women-owned" businesses without satisfying the appropriate level of judicial scrutiny.

**Race- or Sex-Based Program Participation:** A federally funded university's internship program requires that 50% of selected participants be from "underrepresented racial groups" or female students, rejecting equally or more qualified applicants who do not meet these demographic criteria. This extends to any program—such as scholarships, fellowships, or leadership initiatives—that uses race, sex, or any other protected characteristic as a selection criterion, even if framed as addressing underrepresentation.

### D. Training Programs That Promote Discrimination or Hostile Environments

### 1. What Constitutes Unlawful DEI Training Programs?

Unlawful DEI training programs are those that—through their content, structure, or implementation—stereotype, exclude, or disadvantage individuals based on protected characteristics or create a hostile environment. This includes training that:

- Excludes or penalizes individuals based on protected characteristics.

- Creates an objectively hostile environment through severe or pervasive use of presentations, videos, and other workplace training materials that single out, demean, or stereotype individuals based on protected characteristics.

### 2.    Examples of Unlawful Practices

**Trainings That Promote Discrimination Based on Protected Characteristics:** A federally funded school district requires teachers to complete a DEI training that includes statements stereotyping individuals based on protected characteristics—such as "all white people are inherently privileged," "toxic masculinity," etc. Such trainings may violate Title VI or Title VII if they create a hostile environment or impose penalties for dissent in ways that result in discriminatory treatment.[6]

### E.    Recommendations on Best Practices

**Ensure Inclusive Access:** All workplace programs, activities, and resources should be open to all qualified individuals, regardless of race, sex, or other protected characteristics. Avoid organizing groups or sessions that exclude participants based on protected traits. Some sex separation is necessary where biological differences implicate privacy, safety, or athletic opportunity.

**Focus on Skills and Qualifications:** Base selection decisions on specific, measurable skills and qualifications directly related to job performance or program participation. For example, rather than asking about "cultural competence," assess specific skills such as language proficiency or relevant educational credentials. Criteria like socioeconomic status, first-generation status, or geographic diversity must not be used if selected to prioritize individuals based on racial, sex-based, or other protected characteristics.

**Prohibit Demographic-Driven Criteria:** Discontinue any program or policy designed to achieve discriminatory outcomes, even those using facially neutral means. Intent to influence demographic representation risks violating federal law. For example, a scholarship program must not target "underserved geographic areas" or "first-generation students" if the criteria are chosen to increase participation by specific racial or sex-based groups. Instead, use universally applicable criteria, such as academic merit or financial hardship, applied without regard to protected characteristics or demographic goals.

**Document Legitimate Rationales:** If using criteria in hiring, promotions, or selecting contracts that might correlate with protected characteristics, document clear, legitimate rationales unrelated to race, sex, or other protected characteristics. Ensure these rationales are consistently applied and are demonstrably related to legitimate, nondiscriminatory institutional objectives.

**Scrutinize Neutral Criteria for Proxy Effects:** Before implementing facially neutral criteria, rigorously evaluate and document whether they are proxies for race, sex, or other protected

---

[6] Federal law allows for workplace harassment trainings that are focused on preventing unlawful workplace discrimination and that do not single out particular groups as inherently racist or sexist.

characteristics. For instance, a program targeting "low-income students" must be applied uniformly without targeting areas or populations to achieve racial or sex-based outcomes.

**Eliminate Diversity Quotas:** Focus solely on nondiscriminatory performance metrics, such as program participation rates or academic outcomes, without reference to race, sex, or other protected traits. And discontinue policies that mandate representation of specific racial, sex-based, or other protected groups in candidate pools, hiring panels, or final selections. For example, replace a policy requiring "at least one minority candidate per slate" with a process that evaluates all applicants based on merit.

**Avoid Exclusionary Training Programs:** Ensure trainings are open to all qualified participants, regardless of protected characteristics. Avoid segregating participants into groups based on race, sex, or other protected characteristics. Trainings should not require participants to affirm specific ideological positions or "confess" to personal biases or privileges based on a protected characteristic.

**Include Nondiscrimination Clauses in Contracts to Third Parties and Monitor Compliance:** Incorporate explicit nondiscrimination clauses in grant agreements, contracts, or partnership agreements, requiring third parties to comply with federal law, and specify that federal funds cannot be used for programs that discriminate based on protected characteristics. Monitor third parties that receive federal funds to ensure ongoing compliance, including reviewing program materials, participant feedback, and outcomes to identify potential discriminatory practices. Terminate funding for noncompliant programs.

**Establish Clear Anti-Retaliation Procedures and Create Safe Reporting Mechanisms:** Implement and communicate policies that prohibit retaliation against individuals who engage in protected activities, such as raising concerns, filing complaints, or refusing to participate in potentially discriminatory programs. Include these policies in employee handbooks, student codes of conduct, and program guidelines. Provide confidential, accessible channels for individuals to report concerns about unlawful practices.

## V.    CONCLUSION

Entities are urged to review all programs, policies, and partnerships to ensure compliance with federal law, and discontinue any practices that discriminate on the basis of a protected status. The recommended best practices provided in this guidance are non-binding suggestions to assist entities in avoiding legal pitfalls and upholding equal opportunity for all. By prioritizing nondiscrimination, entities can mitigate the legal, financial, and reputational risks associated with unlawful DEI practices and fulfill their civil rights obligations.